**Dan Marius ANDREIU, Petitioner,**

v.

**John ASHCROFT,\* Attorney General, Respondent.**

**No. 99–70274.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted En Banc March 21, 2001

Filed June 18, 2001

---

\* John Ashcroft is substituted for his predecessor, Janet Reno, as Attorney General of the United States. Fed. R.App. P. 43(c)(2).

Before: SCHROEDER, Chief Judge, and HUG, PREGERSON, REINHARDT, BEEZER, FERNANDEZ, RYMER, HAWKINS, TASHIMA, RONALD M. GOULD, and RAWLINSON, Circuit Judges.

Opinion by Judge MICHAEL DALY HAWKINS; Concurrence by Judge BEEZER

MICHAEL DALY HAWKINS, Circuit Judge:

This case requires us to consider the application of certain 1996 amendments to the nation's immigration laws to an alien's motion for stay of removal proceedings pending the resolution of a petition for review. The Immigration and Naturalization Service ("INS") contends that 8 U.S.C. § 1252(f)(2) permits a stay only when the alien shows by clear and convincing evidence that the removal order is prohibited as a matter of law. Section 1252(f), however, limits only a court's power to "*enjoin* the removal of any alien." We conclude, as a matter of statutory construction, that the term "enjoin," in this context, is not equivalent to the term "stay."

## FACTS AND PROCEDURAL BACKGROUND

Linton Joaquin (argued), National Immigration Law Center, Los Angeles, California, for the petitioner.

David M. McConnell (argued) and Linda S. Wernery, Office of Immigration Litigation, Civil Division, Department of Justice, Washington, D.C., for the respondent.

Nadine K. Wettstein, American Immigration Law Foundation, WAshington, DC, for the amici curiae.

Dan Marius Andreiu is a native of Romania. According to his testimony, he was a member of the National Liberal Party, one of the primary political groups responsible for the overthrow of the Ceaucescu regime in Romania's 1989 revolution. On behalf of a group of young intellectuals, he attempted to open a radio station devoted to the views of the National Liberal Party in his hometown of Timisoara. In response to these activities, two individuals

attempted to murder Andreiu in August of 1991 by running him over with an Alfa Romeo. The driver of the car was the son of a former Communist official, and the passenger, nicknamed "Tarzan," was an organized crime figure who had ties to the secret police.

Andreiu then fled Romania. He reached Paris, where he sent an insulting postcard to "Tarzan." Andreiu subsequently came to the United States and was admitted on a six-month visa. He overstayed his visa, and he applied for asylum after the INS sent him a notice to appear on charges of remaining in the United States. Andreiu alleged that he feared political persecution in Romania based on the attempt on his life. He claimed that such individuals are still in power in Romania and are in a position to do him serious harm.

An immigration judge denied Andreiu's asylum claim on February 2, 1998, concluding that his testimony was implausible. Andreiu appealed to the Board of Immigration Appeals ("BIA"). The BIA concluded that the immigration judge improperly determined that Andreiu lacked credibility. Andreiu's testimony, the BIA stated, was "internally consistent with his application for asylum." Nevertheless, the BIA affirmed the immigration judge's decision, on the basis that Andreiu had failed to establish a well-founded fear of persecution or a clear probability of persecution. The BIA concluded that Andreiu entered the United States for economic reasons and that conditions in Romania have substantially improved since the incidents Andreiu described. Andreiu was given fifteen days to leave the country voluntarily.

Andreiu then filed a petition for review with this court and requested a stay of his removal. We temporarily stayed Andreiu's removal pursuant to *De Leon v.*

*INS,* 115 F.3d 643 (9th Cir.1997). The INS opposed Andreiu's stay request, arguing that under 8 U.S.C. § 1252(f)(2) federal courts may only stay an alien's removal if he has shown by clear and convincing evidence that the removal is prohibited as a matter of law. We subsequently appointed pro bono counsel and requested supplemental briefing on the applicability of § 1252(f)(2) to stays of removal pending a petition for review.

On September 8, 2000, the three-judge panel agreed with the INS's interpretation of the statute and denied Andreiu's motion for stay. *Andreiu v. Reno,* 223 F.3d 1111 (9th Cir.2000). Judge Thomas dissented, arguing that the majority disposition was "at odds with the plain language of 8 U.S.C. § 1252(f), the structure of § 1252 as a whole and asylum theory." *Id.* at 1119 (Thomas, J., dissenting). We subsequently granted en banc review. *Andreiu v. Reno,* 237 F.3d 1168 (9th Cir.2000).

We now conclude that § 1252(f)(2) does not limit the power of federal courts to grant a stay of removal. On the merits, however, we conclude that Andreiu does not satisfy the traditional requirements for a stay set forth in *Abbassi v. INS,* 143 F.3d 513 (9th Cir.1998).

## ANALYSIS

■ In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009 (1996), which significantly revised portions of the Immigration and Nationality Act. Prior to passage of IIRIRA, an alien who appealed a decision of the BIA to a United States Court of Appeals was automatically entitled to a stay of removal, unless the court directed otherwise. *See* 8 U.S.C. § 1105a(a)(3) (1994), *repealed by* 8 U.S.C. § 1252(b)(3)(B). IIRIRA eliminated the

automatic stay provision. The current law states, "Service of the petition on the officer or employee does not stay the removal of an alien pending the court's decision on the petition, unless the court orders otherwise." 8 U.S.C. § 1252(b)(3)(B).

This provision establishes that courts retain the power to stay an alien's removal pending a petition for review. The provision, however, does not specify what standards are applicable to an alien's motion for stay.

Andreiu contends that the applicable standard is the one we have traditionally employed for discretionary stays of removal. In *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir.1998), we explained that "[w]e evaluate stay requests under the same standards employed by district courts in evaluating motions for preliminary injunctive relief." That is, the petitioner must show "either a probability of success on the merits and the possibility of irreparable injury, or that serious legal questions are raised and the balance of hardships tips sharply in petitioner's favor." *Id.*

The INS contends, however, that *Abbassi* only interpreted IIRIRA's transitional rules, and that a different result obtains under the permanent rules. According to the INS, a court's decision to grant a motion for stay is governed by § 1252(f)(2). This section states:

> Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such an order is prohibited as a matter of law.

8 U.S.C. § 1252(f)(2). Thus, the core issue is whether the term "enjoin" in this provision encompasses stay orders. We conclude that it does not.

## A. The Text and Structure of the Statute

Our analysis is governed by fundamental principles of statutory construction. A basic guide to the meaning of statutory language is the context of the statute as a whole. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 432, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (quotations and citations omitted). Similarly, "[s]tatutes must be interpreted, if possible, to give each word some operative effect." *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 209, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997).

The provision immediately preceding § 1252(f)(2) states that no court other than the Supreme Court "shall have jurisdiction or authority to *enjoin or restrain* the operation of the provisions of this subchapter. . . ." 8 U.S.C. § 1252(f)(1) (emphasis added). It is clear from this language that Congress did not view the terms "enjoin" and "restrain" as synonymous. If Congress had intended the term "enjoin" to cover the entire universe of judicial power over immigration proceedings, there would have been no need to include the phrase "or restrain." Under the INS's interpretation, this second term is reduced to mere surplusage. If "restrain" has any operative meaning, as we must presume it does, Congress's omission of this term from § 1252(f)(2) must be significant. The only construction that saves § 1252(f)(1) from surplusage is that "enjoin" refers only to the class of actions properly defined as injunctions, not to the full range of judicial action.

Section 1252(b)(3)(B), the only provision in the statute containing the term "stay,"

confirms this reading. This section states, "Service of the petition on the officer does not stay the removal of an alien pending the court's decision on the petition, unless the court orders otherwise." Here, Congress used the specific term "stay" to describe a hold on deportation pending a decision on a petition for review. Yet Congress did not use the term "stay" in § 1252(f), although it could have easily done so. Just as Congress added the term "restrain" to § 1252(f)(1), it could have written § 1252(f)(2) to limit courts' power to "enjoin or stay" the deportation of an alien. But it did not do so, and we will not lightly conclude that this omission was an oversight.

Moreover, if Congress had intended to limit courts' power to stay deportation proceedings pending petitions for review, the most logical place to include that provision would have been in § 1252(b)(3)(B) itself, the provision governing stay orders. It would be quite strange to announce the abolition of automatic stay orders in § 1252(b)(3)(B), but announce the replacement standards in § 1252(f)(2). Indeed, if § 1252(f)(2) has the effect that the INS claims, all of § 1252(b)(3)(B) would be reduced to surplusage. If § 1252(f)(2) clearly means that courts can only issue stays of deportation upon a showing that the order was "prohibited as a matter of law," there would be no need to state in § 1252(b)(3)(B) that stays are not automatic.

The heading of § 1252(f) is also instructive. This heading describes the purpose of the section as a "[l]imit on injunctive relief." As the Supreme Court has explained, "By its plain terms, and even by its title, that provision is *nothing more or less* than a limit on *injunctive relief.* It prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221–1231, but specifies that this ban does not extend to individual cases." *Reno v. American–Arab Anti-Discrimination Comm.,* 525 U.S. 471, 481–82, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (emphasis added). The clear concern of the section is limiting the power of courts to enjoin the operation of the immigration laws, not with stays of removal in individual asylum cases.[1]

This interpretation is supported by the Supreme Court's analysis of IIRIRA in *American–Arab,* which addressed 8 U.S.C. § 1252(g), the provision that immediately follows § 1252(f). Section 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." The Court read this provision narrowly and held that it did not cover the "universe of deportation claims." *American–Arab,* 525 U.S. at 482, 119 S.Ct. 936. The section referred to three discrete actions, no more and no less. The Court found it "implausible that the mention of three discrete events along the road

---

1. This view is echoed in the legislative history of § 1252(f). As the House Report explained, under § 1252(f)(2), "single district courts or courts of appeal do not have authority to enjoin procedures established by Congress to reform the process of removing illegal aliens from the U.S." H.R.Rep. No. 104–469(I), at 161 (1996). "These limitations," however, "do not preclude challenges to the new procedures, but the procedures will remain in force while such lawsuits are pending." *Id.* Specifically referring to § 1252(f)(2), the Report states, "In addition, courts may issue injunctive relief pertaining to the case of an individual alien, and may protect against any immediate violation of rights." *Id.* There is nothing in this legislative history that suggests that § 1252(f)(2) has anything to do with the standards governing stay requests.

to deportation was a shorthand way of referring to all claims arising from deportation proceedings. Not because Congress is too unpoetic to use synecdoche, but because that literary device is incompatible with the need for precision in legislative drafting." *Id.*

Similarly, we will not lightly assume that Congress intended the term "enjoin" in § 1252(f) as shorthand for the term "stay." Congress knew very well how to use the term "stay" when it wanted to, and it is not plausible that here, and only here, Congress meant "enjoin" to include the entire universe of court actions that have a prohibiting or restraining effect.

The INS suggests that construing § 1252(f)(2) in light of other provisions in the statute is contrary to the statute's command that § 1252(f)(2) applies "[n]otwithstanding any other provision of law." But this phrase cannot be sensibly read as foreclosing resort to other sections of the statute in an attempt to determine the meaning of the term "enjoin." Rather, the phrase means that § 1252(f)(2)'s standard for granting injunctive relief in removal proceedings trumps any contrary provision elsewhere in the law. It says nothing about what interpretive techniques are appropriate to determining whether a stay is included within this category of injunctive relief.

Finally, we note the Supreme Court's command that, when possible, we interpret statutes so as to preclude absurd results. *United States v. Wilson*, 503 U.S. 329, 334, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992). The INS's interpretation of § 1252(f)(2) would limit the courts' ability to issue stays of deportation except when the petitioner has shown by "clear and convincing evidence" that the removal order is "prohibited as a matter of law." However, the courts of appeal review the legal determinations of the BIA de novo. *Fisher v.*

*INS*, 79 F.3d 955, 961 (9th Cir.1996) (en banc). In any case raising legal issues, INS's interpretation would require a more substantial showing for a stay of deportation than it would for a reversal on the merits. This would effectively require the automatic deportation of large numbers of people with meritorious claims, including every applicant who presented a case of first impression.

Moreover, adherence to the rigid standard the INS urges would essentially duplicate the decision on the merits, requiring the petitioner to show a *certainty* of success. Such a standard would require full-scale briefing at the beginning of the appellate process, often before the petitioner has even received a copy of the administrative record. In those cases in which a motions panel grants the stay on the basis that the INS's order is clearly prohibited as a matter of law, the issue before the merits panel would be the same issue that a motions panel had previously resolved in favor of the petitioner. None of these results are at all sensible as a matter of judicial administration or of the detailed structure the statute establishes for review of BIA decisions. *See* 8 U.S.C. § 1252.

**B. The Panel Decision**

The panel majority's analysis concluded, based on Black's Law Dictionary, that the plain meaning of "enjoin" includes the grant of a "stay." *Andreiu*, 223 F.3d at 1113. Of course, as Judge Learned Hand pointed out many years ago, "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish." *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.1945), *aff'd*, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945). But even if we were to accept

Black's as definitive, it still does not follow that "enjoin" includes "stay."

Black's defines "enjoin" as "[t]o legally prohibit or restrain *by injunction.*" Black's Law Dictionary 550 (7th ed.1999) (emphasis added). It defines "stay" as the "postponement or halting of a proceeding, judgment or the like." *Id.* at 1425. These are very different definitions. "Enjoin" refers to prohibitions or restraints on conduct through the equitable mechanism of an injunction. A stay, by contrast, is a temporary halt to legal proceedings. Put simply, injunctions run against parties; stays run against courts and judgments. Nothing in Black's suggests that they amount to the same thing. Indeed, Black's definition of "injunction" contains a lengthy list of various types of injunctions; nowhere in this list does the term "stay" appear. *See id.* at 788.

Moreover, Supreme Court precedent forbids simply equating "enjoin" and "stay" on the basis of dictionary definitions. In *Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988), the Court rejected the *Enelow–Ettelson* doctrine, under which, for reasons relating to the merger of law and equity, certain types of stay orders had been considered as injunctions. The Court stated, "An order by a federal court that relates only to conduct or progress of litigation before that court ordinarily is not considered an injunction...." *Id.* at 279, 108 S.Ct. 1133. Any conclusion to the contrary could only be based on "sterile and antiquated doctrine." *Id.* at 287, 108 S.Ct. 1133. With the merger of law and equity, "the practice of describing these stays as injunctions lost all connection with the reality of the federal courts' procedural system." *Id.* at 283, 108 S.Ct. 1133. *Gulfstream* thereby forecloses any automatic equation of the term "enjoin" with the term "stay." The

Court's decision does not necessarily mean that the two terms can never be related, but it does mean that courts must engage in a more probing analysis of the statute before assuming a linguistic identity.

### APPLICATION

■ In order to expedite the resolution of this case, the en banc court concludes it should address the merits of the stay motion rather than remand the motion to the panel. Since under the permanent IIRIRA rules we retain discretion to grant stays although in fewer categories of cases than before, we hold that the standard to be applied under § 1252(f) is the discretionary stay standard in *Abbassi.* Under *Abbassi,* the petitioner must show "either (1) a probability of success on the merits and the possibility of irreparable injury, or (2) that serious legal questions are raised and the balance of hardships tips sharply in the petitioner's favor." *Abbassi,* 143 F.3d at 514 (enumeration added). "These standards represent the outer extremes of a continuum, with the relative hardships to the parties providing the critical element in determining at what point on the continuum a stay pending review is justified." *Id.* We conclude that, even under the more generous *Abbassi* standard, the panel's conclusion that Andreiu is not entitled to a stay is correct.

■ As to the first *Abbassi* test, Andreiu has not demonstrated a probability of success on the merits. The BIA concluded that Andreiu had not established a well-founded fear of persecution. Andreiu presented evidence of a single 1991 attack by figures tenuously connected to the government, but presented no evidence demonstrating that the current Romanian government or its officials desire to do him harm. As such, we cannot find on this record that Andreiu has demonstrated a probability of success on the merits.

Turning to the second *Abbassi* test, we note that Andreiu's petition consists primarily of conclusory allegations that the BIA's decision was based on "frivolous grounds." Andreiu also contends that he was unable to obtain certain evidence while in INS detention.[2] Although these claims might arguably raise a serious legal question, the balance of hardships does not "tip sharply" in Andreiu's favor.

Ordinarily, the balance of hardships will weigh heavily in the applicant's favor, especially if it appears that the country of origin will not freely permit a return to the United States upon a grant of asylum. Other important factors include separation from family members, medical needs, and potential economic hardship.

None of these factors are implicated in this case. As the BIA noted, Andreiu is the son of a wealthy land-owner and a member of an educated Romanian family. Unlike many asylum applicants, he is unlikely to face economic hardship if he were to return to Romania. Andreiu does not appear to have any family in the United States from whom he would be required to separate. Moreover, given the improvements in Romania since 1989, Andreiu's claims of possible persecution, by themselves, are insufficient to show genuine hardship. *Cf. Lucacela v. Reno*, 161 F.3d 1055, 1056 (7th Cir.1998) (denying stay of removal to Romanian asylum applicant and noting the substantial improvements in Romania). Finally, we note that during the time in which Andreiu alleged political persecution, he had visas to visit other countries and made up to eight trips outside of Romania between 1990 and 1991. As such, Andreiu cannot establish that he will be unable to return freely to the United States should his petition be successful.

Our decision to deny the stay, of course, is not a decision on the merits of Andreiu's petition for review, and nothing we hold today is meant to prejudice Andreiu's ability to advance any of the claims asserted for review in subsequent proceedings.

## CONCLUSION

Section 1252(f)(2) does not limit our ability to stay the deportation of asylum seekers pending the resolution of their petitions for review. To hold otherwise, as Judge Thomas noted, would mean that "thousands of asylum seekers who fled their native lands based on well-founded fears of persecution will be forced to return to that danger under the fiction that they will be safe while waiting the slow wheels of American justice to grind to a halt." *Andreiu*, 223 F.3d at 1127–28 (Thomas, J., dissenting). The statute cannot support such a reading, and we are convinced that Congress had no such intent in mind.

It is also clear, however, that Congress did not intend for courts to grant stays of removal every time an alien files a petition for review. *See* 8 U.S.C. § 1252(b)(3)(B). If we were to grant a stay on the facts of this case, we would be effectively making stays of removal automatic. We decline to do so. *Abbassi* struck a careful balance between the government's interest in enforcing the immigration laws and the asylum seeker's interest in avoiding undue hardship. We see no reason to disturb the holding in *Abbassi*. Because the hardship analysis in this case does not weigh in favor of the petitioner, we accordingly deny Andreiu's motion.

**MOTION FOR STAY DENIED.**

---

**2.** The documents Andreiu sought to introduce would have confirmed his membership in the National Liberal Party. His membership in this party, however, does not seem to be in serious dispute.

BEEZER, Circuit Judge, separately concurring:

I concur in the court's judgment, which is founded on a determination that Andreiu does not satisfy the requirements for a stay under *Abbassi v. Immigration and Naturalization Service*, 143 F.3d 513, 514 (9th Cir.1998), and that Andreiu is not entitled to a stay of deportation pending appeal.

*Abbassi* requires the alien to "show either a probability of success on the merits and the possibility of irreparable injury, or that serious legal questions are raised and the balance of hardships tips sharply in petitioner's favor." *Id.* at 514.

This appeal goes beyond *Abbassi* and requires us to address an important issue of statutory construction affecting removal proceedings under the new rules enacted in the Illegal Immigration Reform and Immigrant Responsibility Act. This law requires a petitioner seeking review to meet a significantly higher standard before the court is authorized to grant a temporary stay of removal pending appeal from a final decision of the Board of Immigration Appeals.

The court's opinion denies Andreiu a stay of deportation pending appeal. The opinion adopts the court-created *Abbassi* standard, which is less stringent than the statutory requirements for stays of deportation pending appeal. The opinion of the court rejects the statutory prescription of Congress as evidenced in the plain text of 8 U.S.C. § 1252(f)(2). It is the failure of the court's opinion to apply the statutory standard that provokes me to write separately. If the court persists in applying the lenient *Abbassi* standard after the passage of the Illegal Immigration Reform and Immigrant Responsibility Act, then it shall thwart the intention of Congress, and stays of removal pending appeal will issue virtually "on request."[1]

## I

The plain text of the Illegal Immigration Reform and Immigrant Responsibility Act severely limits our power to stay an order of the Board of Immigration Appeals requiring removal of an alien. Section 1252(f)(2) states:

Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such an order is prohibited as a matter of law.

8 U.S.C. § 1252(f)(2). Because I believe the plain meaning of "enjoin" encompasses the grant of a temporary stay, I would hold that subsection (f)(2)'s limit on our power to "enjoin" the removal of an alien clearly applies to the stay of a removal order pending resolution of an alien's petition for review of a final order of the Board of Immigration Appeals.

To determine whether subsection (f)(2) applies to stays, "we must first look to the statutory language: 'The starting point in interpreting a statute is its language, for if the intent of Congress is clear, that is the end of the matter.'" *United States v. Morales–Alejo*, 193 F.3d 1102, 1105 (9th Cir.1999) (quoting *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993)). Both the

---

1. Other circuits' experience with similarly lenient standards bears out this observation. *See, e.g., Ofosu v. McElroy*, 98 F.3d 694 (2d Cir.1996) (proclaiming that "ordinarily, when a party seeks [a stay] pending appeal, it is deemed that exclusion is an irreparable harm, and that the INS suffers no offsetting injury"); *Sofinet v. Immigration and Naturalization Service*, 188 F.3d 703, 707 (7th Cir.1999) (requiring only that a petitioner show a "better than negligible" chance of success on the merits portion of the stay test).

dictionary and widespread judicial usage indicate that the term "stay" refers to a type of injunction. Consequently, subsection (f)(2)'s strict limit of our power to enjoin similarly restricts our ability to issue a stay.

Courts frequently turn to legal dictionaries when interpreting the clear language of a statute. *See, e.g., Bartnicki v. Vopper*, 531 U.S. 990, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001) (citing Black's Law Dictionary definition of "disclosure" in interpreting 18 U.S.C. § 2511(1)(c)). Black's Law Dictionary defines a "stay" as "a kind of injunction." Black's Law Dictionary 1413 (6th ed.1990).[2] It defines "restrain" as "to enjoin," *id.* at 1314; to "enjoin" is to require "a writ of injunction, to perform, or to abstain or desist from, some acts." *Id.* at 529. Finally, an injunction is "[a] court order prohibiting someone from doing some specified act." *Id.* at 784. These terms describe identical actions by a court which prevent some occurrence from taking place.

Courts' common use of the terms "enjoin" and "stay" also demonstrates that these terms are not mutually exclusive. Both the Supreme Court of the United States and our court use these terms interchangeably or otherwise indicate that "enjoin" encompasses "stay."[3] *See, e.g., NLRB v. Nash–Finch Co.*, 404 U.S. 138, 139–41, 144, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971) (holding that the NLRB's attempt to *"enjoin"* or *"restrain"* a state court injunction falls under the exception of 28 U.S.C. § 2283: "A court of the United States may not grant an *injunction* to *stay* proceedings in a State court except as expressly authorized by ... Congress ....") (emphases added); *Gruntz v. County of Los Angeles (In re Gruntz)*, 202 F.3d 1074, 1087 (9th Cir.2000) (en banc) (holding that "Congress did not intend the [bankruptcy] *stay* to *enjoin* all state criminal proceedings automatically") (emphases added); *Pacific Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1022 (9th Cir.1991) (applying statute that proscribes appeals from an interlocutory order "refusing to *enjoin* an arbitration" to an appeal from a court's "denial of a *stay* of arbitration") (emphases added). Congress legislated in light of this long history of synonymous usage of the terms "enjoin" and "stay." Surely that history is relevant, particularly when the statute does not specify that the court is to understand the terms in a new way.

Further bolstering the conclusion that Congress intended the term "enjoin" to

---

**2.** The sixth edition of Black's Law Dictionary was current at the time Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act in 1996. For that reason its definitions control where they differ from the more recent seventh edition, which was not published until 1999.

**3.** The Supreme Court's decision in *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988), does not compel a different result. First, I note that *Gulfstream* dealt with whether a court's refusal to stay its own proceedings constituted a "final order" appealable pursuant to 28 U.S.C. § 1291. 485 U.S. at 275, 108 S.Ct. 1133. That is a very different issue from the one this court faces today. Second, it is clear that the Supreme Court's distinc-

tion between a stay and an injunction referred only to a *particular type of stay* used prior to the law-equity merger, which an official acting as both chancellor and law judge would issue to halt proceedings. *Id.* at 283–88, 108 S.Ct. 1133 ("Our holding today merely prevents interlocutory review of district court orders on the basis of historical circumstances that have no relevance to modern litigation."). Here, on the other hand, the text and context of the statute clearly demonstrate that Congress—acting several years after *Gulfstream*—intended an identical standard for the grant of stays and injunctions, regardless of any esoteric distinction that may be drawn between the two in the historical circumstances of that case.

encompass stays is the fact, of which Congress presumably was aware, that the courts have long reviewed motions for a stay under the same equitable standard as motions for a preliminary injunction. *See, e.g., Coleman v. PACCAR, Inc.*, 424 U.S. 1301, 1305, 96 S.Ct. 845, 47 L.Ed.2d 67 (1976) ("A court staying the action of … an administrative agency must take into account factors such as irreparable harm and probability of success on the merits.") (internal citations omitted); *Abbassi*, 143 F.3d at 514 ("We evaluate stay requests under the same standards employed by district courts in evaluating motions for preliminary injunctive relief."). This similarity in the judicial treatment of injunctions and stays is yet another reason it is difficult to comprehend why Congress did not explicitly provide for a lenient standard to apply to stays if it intended such a standard to apply. This failure is doubly curious when one notes that the statute refers to "enjoin" without specifying any differential treatment of requests for preliminary and permanent injunctions. 8 U.S.C. § 1252(f)(2). Congress declined to make any procedural distinction in the statute based on whether an injunction is preliminary or permanent, although preliminary injunctions are granted without a full adjudication on the merits while permanent injunctions only take effect as part of a final judgment. Charles Alan Wright & Arthur R. Miller, 11 Federal Practice & Procedure § 2947 (2d ed. 1995). This decision to treat the two different types of injunctions identically hints strongly at a legislative intent to treat their subspecies, the stay, in the same manner.

The opinion of the court does not commence its analysis with the statutory language, as required by *Morales–Alejo,* 193 F.3d at 1105, but rather ends with it, asserting that "enjoin" applies only to restraints on "parties," but not to restraints on courts or legal proceedings. Slip op. at 7614. Not only is this approach disordered, it is incorrect on the merits. Nothing in subsection (f)(1) indicates that "restrain" applies exclusively to temporary orders against courts or legal proceedings or that "enjoin" refers only to permanent relief against parties. 8 U.S.C. § 1252(f)(1) (instructing that no court, other than the Supreme Court, shall "enjoin or restrain the operation of the provisions of part IV of this subchapter"). There is nothing the court's opinion can glean from the statute in support of the assertion that Congress used "enjoin" only in relation to permanent orders, rather, the court's interpretation is contrary to the plain meaning of the word "enjoin."[4] *See, e.g., Miller v. French,* 530 U.S. 327, 334, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (noting motion "for a *temporary* restraining order or *preliminary* injunction to *enjoin* the operation of the automatic stay") (emphases added).

## II

The structure of the Illegal Immigration Reform and Immigrant Responsibility Act also supports the conclusion that the law now limits the authority of the court to enter a stay order pending appeal from the Board of Immigration Appeals. It is not

---

4. Contrary to the assertion of the court's opinion, this construction of the statute does not render the words "enjoin or restrain" in § 1252(b)(3)(B) surplusage. Subsection(b)(3)(B) provides that "Service of the petition on the officer does not stay the removal of an alien pending the court's decision on the petition, unless the court orders otherwise." Within the context of that sentence, the verb "stay" clearly denotes an *automatic* halt in removal proceedings, not the (noun) "stay" requested by motion that is currently before the court.

the court's business to tell Congress how to structure a statute.

Today, the court is required to look at a statute that says, "notwithstanding any other provision of law," a plain and direct phrase. The court should give the congressional direction the respect and weight to which it is entitled.

The court's opinion holds that the structure of subsection (f) precludes the application of subsection (f)(2) to stays, because

> if Congress had intended to limit courts' power to stay deportation proceedings pending petitions for review, the most logical place to include that provision would have been in § 1252(b)(3)(B) itself, the provision governing stay orders. .... [I]f § 1252(f)(2) has the effect that the INS claims, all of § 1252(b)(3)(B) would be reduced to surplusage.

Slip op. at 481.

This construction is incorrect. Initially, I observe that subsection (f)(2) explicitly states that it applies "[n]otwithstanding any other provision of law." Moreover, subsections (c) and (d) of § 1252 govern judicial treatment of petitions for review. The structure of § 1252, therefore, does not require that subsection (b) act as the sole provision related to petitions for review and does not gainsay the conclusion that subsection (f)(2) clearly applies to the grant of a temporary stay. *Cf. Maldonado v. Fasano*, 67 F.Supp.2d 1170, 1175 (S.D.Cal.1999) (observing that § 1252(f)(2) "appears to displace" the *Abbassi*, pre-Illegal Immigration Reform and Immigrant Responsibility Act, standard for grant of a stay).

The opinion of the court further reasons that because subsection (f)(1) addresses only collateral review for class actions,[5] we should interpret subsection (f)(2) as limiting only collateral injunctive relief for individuals. Slip op. at 481. I disagree. Subsection (f)(2) limits a court's power to "enjoin the removal of any alien pursuant to a final order under this section." A Board of Immigration Appeals decision is a "final order" of removal. *See* 8 U.S.C. § 1101(a)(47)(B)(i) (Supp. II 1996). "[T]his section" refers not merely to subsection (f), but to the whole of § 1252. *See American–Arab*, 525 U.S. at 487, 119 S.Ct. 936 (holding that reference in subsection (g) to "this section" refers to the entirety of § 1252). Nothing in the statutory language suggests that subsection (f)(2) implicates only collateral matters.

## III

The court's opinion concludes that subsection (f)(2) would improperly require a higher standard to obtain a stay of removal than to succeed on the merits of a petition for review. Slip op. at 482. Applying a higher standard to motions for a stay, however, is not improper. *See Ratzlaf v. United States*, 510 U.S. 135, 140, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). Moreover, although the heightened standard in subsection (f)(2) may seem severe as applied to temporary stays, it is entirely consistent with the provisions and policy goals of the Illegal Immigration Reform and Immigrant Responsibility Act. Congress has made clear its desire to expedite

---

**5.** The Supreme Court has held that subsection (f)(1) limits "classwide injunctive relief against the operation of §§ 1221–1231, but specifies that this ban does not extend to individual cases." *Reno v. American–Arab Anti–Discrimination Comm.*, 525 U.S. 471, 481–82, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999); *see also* 8 U.S.C. § 1252(f)(1) ("[N]o court (other than the Supreme Court) shall have jurisdiction ... to enjoin or restrain the operation of [§§ 1221 to 1231] ... other than with respect to the application of such provisions to an individual alien....").

removal proceedings. *See Kalaw v. Immigration and Naturalization Service.*, 133 F.3d 1147, 1149 (9th Cir.1997) (noting Congress's intent to vest the Board of Immigration Appeals with final appellate jurisdiction in most deportation proceedings); *Reno v. American–Arab Anti–Discrimination Comm.*, 525 U.S. 471, 486, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) ("[*M* ]any provisions of [the Illegal Immigration Reform and Immigrant Responsibility Act] are aimed at protecting the Executive's discretion from the courts-indeed, that can fairly be said to be the theme of the legislation."). The new act has even foreseen the possibility that an alien with a meritorious petition for review may be removed from the country before a court grants the petition. 8 U.S.C. § 1252(b)(3)(B) ("Service of the petition ... does not stay the removal of an alien pending the court's decision on the petition, unless the court orders otherwise.").

The argument that applying subsection (f)(2) to stays inappropriately compels the court to engage in a full review of the merits is likewise unpersuasive. Slip op. at 482. Examination of the merits may be necessary under both the standard of subsection (f)(2) and the preliminary injunction standard that the court's opinion adopts.

For these reasons, I would hold that subsection (f)(2) applies to an alien's motion to stay a final removal order pending resolution of a petition for review.

## IV

Under § 1252(f)(2), the Court of Appeals is not permitted to stay a final order of removal "unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law." The court must address the impact of this standard as applied to both findings of fact and conclusions of law made by the Board of Immigration Appeals in support of its final order of removal.

I am unable to apply the "clear and convincing" standard to legal questions because "clear and convincing evidence" speaks only to factual issues. *See, e.g., California ex rel. Cooper,* 454 U.S. 90, 92–93, 102 S.Ct. 172, 70 L.Ed.2d 262 (1981) (stating that standards of proof such as "clear and convincing" instruct "the factfinder concerning the degree of confidence our society thinks he should have in the correctness of *factual* conclusions") (emphasis added); Black's Law Dictionary 555 (6th Ed.1990) (defining "evidence" as something "offered in proof of an alleged *fact* ") (emphasis added). Subsection (f)(2)'s imposition of a factual standard of proof requires a standard of review for legal issues that best reflects Congressional intent.

Congress's requirement of "clear and convincing evidence" that a removal order is "prohibited as a matter of law" is best satisfied, with regard to legal issues, by requiring an alien to establish that a removal order was "manifestly contrary to law." *Cf.* 8 U.S.C. § 1252(b)(4)(C), (D) (stating that eligibility decisions and the Attorney General's discretionary judgment to grant asylum are conclusive "unless manifestly contrary to law").

Although the phrase "manifestly contrary to law" is not well-established, its terms are familiar. "Manifest" describes something that is apparent, clear, indisputable, obvious or plain. *See Dickinson v. Zurko,* 527 U.S. 150, 155, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (stating that "manifest error," "clear case of error" and "clearly wrong" are phrases that "might be thought to mean the same thing"); Webster's Third New International Dictionary 1375 (1993) (defining "manifest" as, *inter*

*alia,* "capable of being easily understood or recognized at once by the mind: not obscure: obvious"); Black's Law Dictionary 563 (7th ed.1999) (defining "manifest error" as "[a]n error that is plain and indisputable, and that amounts to a complete disregard of the controlling law or the credible evidence in the record"); *id.* at 814 (defining "manifest intent" as "[i]ntent that is apparent or obvious"). "The term 'contrary to law' means contrary to any existing law." *Olais–Castro v. United States,* 416 F.2d 1155, 1158 n.8 (9th Cir. 1969) (citing *Callahan v. United States,* 285 U.S. 515, 517, 52 S.Ct. 454, 76 L.Ed. 914 (1932)). More specifically, "contrary" is defined as " 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.' " *Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (quoting Webster's Third New International Dictionary 495 (1976)). That the court would reach a different legal conclusion is insufficient; to grant a stay under the "manifestly contrary to law" standard, the court must independently arrive at the conclusion that the removal order is clearly antithetical to an existing law. This standard represents a legal approximation of "clear and convincing" evidence and furthers the Illegal Immigration Reform and Immigrant Responsibility Act's goal of respecting the finality of Board of Immigration Appeals orders.

## V

I would deny Andreiu's motion for a stay because he wholly failed by any measure of evidence, much less clear and convincing evidence, to show that the Board of Immigration Appeals order was based on an erroneous finding of fact or that it was manifestly contrary to law as required by 8 U.S.C. § 1252(f)(2). I would reject application of the less stringent standard established in *Abbassi.* The application of the *Abbassi* standard is no longer suffi-cient to bar the removal pendente lite of an alien found by the Board of Immigration Appeals to be deportable.