BARBARA MILANO KEENAN, Circuit Judge,
with whom JUDGE THACKER joins except as to Part II.A.L, concurring in part and concurring in the judgment:
I concur in the majority opinion’s analysis with respect to its conclusions: (1) that the stated “national security purpose” of the Second Executive Order[1] likely fails Mandel’s “bona fide” test and violates the Establishment Clause, see Kleindienst v. Mandel, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); and (2) that the record before us supports the award of a nationwide injunction.[2] I write separately to express my view that although the plaintiffs are unlikely to succeed on the merits of their claim under Section 1152(a)(1)(A), their request for injunctive relief under the INA nevertheless is supported by the failure of Section 2(c) to satisfy the threshold requirement of Section 1182(f) for the President’s lawful exercise of authority.[3]
I.
As an initial matter, I conclude that John Doe #1 has standing to raise a claim that the Second Executive Order violates *607 the INA.[4] To establish standing under Article III, a plaintiff must show that he has “(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.” Spokeo, Inc. v. Robins, — U.S. —, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). A plaintiff seeking “to enjoin a future action must demonstrate that he is immediately in danger of sustaining some direct injury as the result” of the challenged conduct, which threat of injury is “both real and immediate.” Beck v. McDonald, 848 F.3d 262, 277 (4th Cir. 2017) (internal quotation marks omitted) (quoting Lebron v. Rumsfeld, 670 F.3d 540, 560 (4th Cir. 2012)).
Prolonged separation from one’s family members constitutes a cognizable injury-in-fact. See Legal Assistance for Vietnamese Asylum Seekers v. Dep’t of State, 45 F.3d 469, 471 (D.C. Cir. 1995), vacated on other grounds, 519 U.S. 1, 117 S.Ct. 378, 136 L.Ed.2d 1 (1996) (per curiam). As the government concedes, by barring entry of nationals from the six identified countries, Section 2(c) of the Second Executive Order operates to delay, or ultimately to prevent, the issuance of visas to nationals from those countries.
Before the President issued the Second Executive Order, John Doe #1 filed a visa application on behalf of his Iranian national wife, and took substantial steps toward the completion of the visa issuance process. However, his wife’s request for a visa is still pending. It is self-evident from the language and operation of the Order that the 90-day “pause” on entry, which the government may extend, is likely to delay the issuance of a visa to John Doe #l’s wife and her entry into the United States, a likelihood that is not remote or speculative.[5] Accordingly, I conclude that John Doe #1 has established the existence of an injury-in-fact that is fairly traceable to the Second Executive Order, and which is likely to be redressed by a favorable decision in this case.
II.
I turn to consider whether the plaintiffs are entitled to a preliminary injunction based on the likelihood that the Second Executive Order violates the INA. This Court evaluates a district court’s decision to grant a preliminary injunction based on an abuse-of-discretion standard. Aggarao v. MOL Ship Mgmt. Co., 675 F.3d 355, 366 (4th Cir. 2012). Under this standard, we review the district court’s factual findings for clear error and review its legal conclusions de novo. Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011).
A preliminary injunction is an “extraordinary remedy,” which may be awarded only upon a “clear showing” that a plaintiff is entitled to such relief. The Real Truth About Obama, Inc. v. FEC, 575 F.3d 342, 345-46 (4th Cir. 2009) (citing Winter v. Nat. Res. Def. Council, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)), vacated *608 on other grounds, 559 U.S. 1089, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010). Preliminary relief affords a party before trial the type of relief ordinarily available only after trial. Id. at 345. A preliminary injunction must be supported by four elements: (1) a likelihood of success on the merits; (2) that the plaintiff likely will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities weighs in the plaintiffs fayor; and (4) that a preliminary injunction is in the public interest. Id. at 346.
A.
I begin by considering whether the plaintiffs are likely to succeed on the merits of a claim that the Second Executive Order fails to comply with the requirements of the INA. In interpreting a statute, courts first must consider the plain meaning of the statutory language. United States v. Ide, 624 F.3d 666, 668 (4th Cir. 2010). A statute’s plain meaning derives from consideration of all the words employed, rather than from reliance on isolated statutory phrases. Id. (citing United States v. Mitchell, 518 F.3d 230, 233-34 (4th Cir. 2008)).
i.
Initially, I would reject the plaintiffs’ contention that 8 U.S.C. § 1152(a)(1)(A), which prohibits discrimination on the basis of nationality in the issuance of immigrant visas, operates as a limitation on the President’s authority under 8 U.S.C. § 1182(f) to “suspend the entry of all aliens or any class of aliens” if he finds that the entry of such aliens “would be detrimental to the interests of the United- States.” Section 1152(a)(1)(A) provides that:
[N]o person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person’s race, sex, nationality, place of birth, or place of residence.
Thus, the plain language of Section 1152(a)(1)(A) addresses an alien’s ability to obtain an immigrant visa. Section 1182(f), on the other hand, explicitly addresses an alien’s ability to enter the United States, and makes no reference to the issuance of visas. See 8 U.S.C. § 1182(f). I am unpersuaded by the plaintiffs’ attempt to read into Section 1152(a)(1)(A) terms that do not appear in the statute’s plain language.
Sections 1152(a)(1)(A) and 1182(f) address two distinct actions in the context of immigration, namely, the issuance of a visa and the denial of an alien’s ability to enter the United States. Indeed, the fact that an alien possesses a visa does not guarantee that person’s ability to enter the United States. For example, an alien who possesses a visa may nonetheless be denied admission into the United States for a variety of reasons set forth elsewhere in the INA. See 8 U.S.C. § 1201(h) (“Nothing in this chapter shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted [sic] the United States, if, upon arrival at a port of entry in the United States, he is found to be inadmissible under this chapter, or any other provision of law.”). For these reasons, I would reject the plaintiffs’ assertion that Section 1152(a)(1)(A) provides a basis for affirming the preliminary injunction issued by the district court.
ii.
Nevertheless, I would conclude that the plaintiffs’ request for injunctive relief is supported by the President’s failure to comply with Section 1182(f). In issuing his proclamation under Section 2(c), the President relied exclusively on two provisions of the INA. The President stated in material part:
*609 I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. § 1182(f) and 1185(a), that the unrestricted entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen would be detrimental to the interests of the United States. I therefore direct that the entry into the United States of nationals of those six countries be suspended for 90 days from the effective date of this order, subject to the limitations, waivers, and exceptions set forth in sections 3 and 12 of this order.
82 Fed. Reg. at 13,213.
Section 1185(a), however, does not confer any authority on a president. Instead, that statute imposes certain requirements on persons traveling to and from the United States, and renders unlawful their failure to comply with the requirements of the statute.
In contrast, Section 1182(f) addresses a president’s authority to impose restrictions on the entry of aliens into the United States. Section 1182(f) states, in relevant part: “Whenever the [president finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States,” the president may “suspend the entry [into the United States] of all aliens or any class of aliens.” Although this language provides broad discretion to a president to suspend the entry of certain aliens and classes of aliens, that discretion is not unlimited.
The plain language of Section 1182(f) permits a president to act only if he “finds” that entry of the aliens in question “would be detrimental to the interests of the United States” (emphasis added). In my view, an unsupported conclusion will not satisfy this “finding” requirement. Otherwise, a president could act in total disregard of other material provisions of the INA, thereby effectively nullifying .that complex body of law enacted by Congress.
Here, the President’s “finding” in Section 2(c) is, in essence, a non sequitur because the “finding” does not follow from the four corners of the Order’s text. In particular, the text fails to articulate a basis for the President’s conclusion that entry by any of the approximately 180 million[6] individuals subject to the ban “would be detrimental to the interests of the United States.”
I reach this conclusion by examining the Order’s relevant text. In Section 1(a) of the Order, the President declares that the policy of the United States is “to protect its citizens from terrorist attacks, including those committed by foreign nationals,” and “to improve the screening and vetting protocols and procedures” involved in issuing visas and in the administration of the United States Refugee Admissions Program. 82 Fed. Reg. at 13,209. The Order explains that such screening and vetting procedures are instrumental “in detecting foreign nationals who may commit, aid, or support acts of terrorism and in preventing those individuals from entering the United States.” Id.
*610 The Order further states that the governments of Iran, Libya, Somalia, Sudan, Syria, and Yemen are unlikely to be -willing or able “to share or validate important information about individuals seeking to travel to the United States,” because these countries: (1) have porous borders facilitating “the illicit flow of weapons, migrants, and foreign terrorist fighters”; (2) have-been compromised by terrorist organizations; (3) contain “active conflict zones”; or (4) are state sponsors of terrorism. Id. at 13,210-11. In light of these conditions, the Second Executive Order proclaims that “the risk of erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts or otherwise harm the national security of the United States is unacceptably high.” Id. at 13,211.
Significantly, however, the Second Executive Order does not state that any nationals of the six identified countries, by virtue of their nationality, intend to commit terrorist acts in the United States or otherwise pose a detriment to the interests of the United States. Nor does the Order articulate a relationship between the unstable conditions in these countries and any supposed propensity of the nationals of those countries to commit terrorist acts or otherwise to endanger the national security of the United States. For example, although the Order states that several of the six countries permit foreigners to establish terrorist safe havens within the countries’ borders, the Order does not assert that any nationals of the six countries are likely to have joined terrorist organizations operating within those countries, or that members of terrorist organizations are likely to pose as nationals of these six countries in order to enter the United States to “commit, aid, or support acts of terrorism.” See id. at 13,210-12 (noting, among other things, that the Syrian government “has allowed or encouraged extremists to pass through its territory to enter Iraq,” and that “ISIS continues to attract foreign fighters to Syria and to use its base in Syria to plot or encourage attacks around the globe, including in the United States”).
The text of the Second Executive Order therefore does not identify a basis for concluding that entry of any member of the particular class of aliens, namely, the more than 180 million nationals of the six identified countries, would be detrimental to the interests of the United States. In the absence of any such rationale articulating the risks posed by this class of foreign nationals, the President’s proclamation under Section 2(c) does not comply with the “finding” requirement of the very statute he primarily invokes to issue the ban imposed by Section 2(c).
The government asserted at oral argument in this case that the Second Executive Order nevertheless can stand on the rationale that the President is “not sure” whether any of the 180 million nationals from the six identified countries present a risk to the United States. Oral Arg. 38:04-40:11.1 disagree that this rationale is sufficient to comply with the specific terms of Section 1182(f). Although this statute does not require the President to find that the entry of any alien or class of aliens would present a danger to the United States, the statutory text plainly requires more than vague uncertainty regarding whether their entry might be detrimental to our nation’s interests. Indeed, given the scope of Section 2(c), the President was required under Section 1182(f) to find that entry of any members of the identified class would be detrimental to the interests of the United States.
Instead of articulating a basis why entry of these foreign nationals “would be detrimental” to our national interests, the Or *611 der merely proposes a process under which the executive branch will study the question. See 82 Fed. Reg. at 13,212-13. This “study” proposal is an implicit ac-knowledgement that, presently, there is no affirmative basis for concluding that entry of nationals from these six countries “would be detrimental to the interests of the United States.” 8 U.S.C. § 1182(f) (emphasis added).
The government likewise fails in its attempt to justify the Second Executive Order by relying on the prior exclusion of individuals from the Visa Waiver Program who had certain connections to the six countries identified in the Order. See 82 Fed. Reg. at 13,209. Generally, the Visa Waiver Program allows nationals of specific countries to travel to the United States without a visa for purposes of tourism or business for up to 90 days. See generally 8 U.S.C. § 1187. Based on modifications to the Program made by Congress in 2015 and by the Secretary of Homeland Security in 2016, people with certain connections to the six named countries no longer were permitted to participate in the Program.[7] As a result, those newly ineligible aliens became subject to the standard procedures required for the issuance of visas.[8] Thus, exclusion from the Visa Waiver Program merely reimposed for such aliens the customary requirements for obtaining a visa, and did not impose any additional conditions reflecting a concern that their entry “would be detrimental to the interests of the United States.” Further, the above-described limitations of the Visa Waiver Program underscore the fact that, currently, the relevant class of aliens does not enjoy “unrestricted entry” into the United States as incorrectly stated in Section 2(c) of the Second Executive Order. See 82 Fed. Reg. at 13,213 (emphasis added).
Accordingly, I would hold that the text of Section 2(c) fails to meet the statutory precondition for the lawful exercise of a president’s authority under Section 1182(f). I thus conclude that the plaintiffs likely would succeed on the merits of this particular statutory issue. See Winter, 555 U.S. at 20, 129 S.Ct. 365.
B.
I also would conclude with respect to Section 1182(f) that the plaintiffs would satisfy the remaining Winter factors, because they are “likely to suffer irreparable harm in the absence of preliminary relief,” the balance of the equities would resolve in their favor, and an injunction would be in the public interest. Id. First, at a minimum, plaintiff John Doe #1 has shown that absent an injunction, he" likely will be subject to imminent and irreparable harm based on the prolonged separation from his wife that will result from enforcement of the Second Executive Order. See Andreiu v. Ashcroft, 253 F.3d 477, 484 (9th Cir. 2001) (en banc). And, based on my conclusion that Section 2(c) is invalid on its face, I would hold that an injunction should be issued on a nationwide basis.
*612 Next, the balance of harms weighs in favor of granting a preliminary injunction. See Winter, 555 U.S. at 24, 129 S.Ct. 365. The government’s interest in enforcing laws related to national security as a general matter would be a strong factor in its favor. See Haig v. Agee, 453 U.S. 280, 307, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981). However, because the Second Executive Order does not comply with the threshold requirement for a president’s lawful exercise of authority under Section 1182(f), the government’s interest cannot outweigh the real harms to the affected parties. See Washington v. Trump, 847 F.3d 1151, 1168 (9th Cir. 2017) (reviewing the First Executive Order, dismissing the government’s claim of irreparable injury, and noting that “the Government has done little more than reiterate” its general interest in combating terrorism).
Finally, the public interest also strongly favors a preliminary injunction, because the public has an interest “in free flow of travel” and “in avoiding separation of families.” Id. at 1169. And, most importantly, the public interest is served by ensuring that any actions taken by the President under Section 1182(f) are lawful and do not violate the only restraint on his authority contained in that statute.
III.
Accordingly, in addition to affirming the district court’s judgment with respect to the plaintiffs’ Establishment Clause claim and the issuance of a nationwide injunction, I would affirm the court’s judgment and award of injunctive relief on the separate basis that the Second Executive Order is invalid on its face because it fails to comply with the “finding” requirement of Section 1182(f).

. Exec. Order No. 13,780, Protecting the. Nation from Foreign Terrorist Entry Into the United States, 82 Fed. Reg. 13,209 (Mar. 6, 2017).

. Based on my view that the Second Executive Order does not satisfy the threshold requirement of 8 U.S.C. § 1182(f) for exercise of a president's authority under that statute, I would conclude that the Second Executive Order is not "facially legitimate” within the meaning of Mandel, 408 U.S. at 770, 92 S.Ct. 2576. Nevertheless, I join in the majority opinion’s holding that the plaintiffs are likely to succeed on the merits of their Establishment Clause claim, based on my further conclusion that the Second Executive Order likely fails Mandel's "bona fide” test. In reaching this conclusion, I additionally note that I do not read the majority opinion as holding that a plausible allegation of bad faith alone would justify a court’s decision to look behind the government’s proffered justification for its action. Rather, in accordance with Justice Kennedy’s concurrence in Din, a plaintiff must make an affirmative showing of bad faith to satisfy the “bona fide” requirement of Mandel. See Kerry v. Din, — U.S. —, 135 S.Ct. 2128, 2140-41, 192 L.Ed.2d 183 (2015) (Kennedy, J., concurring in the judgment).

. We may consider this facial deficiency not raised by the plaintiffs because this defect is apparent from the record. See Drager v. PLIVA USA, Inc., 741 F.3d 470, 474 (4th Cir. 2014) (explaining that the Court may affirm on any grounds apparent from the record).

. Because only one plaintiff must have standing for the Court to consider a particular claim, I do not address whether the other plaintiffs also have standing to challenge the Second Executive Order under the INA. See Bostic v. Schaefer, 760 F.3d 352, 370-71 (4th Cir. 2014).

. For the same reasons, I reject the government's contention that the plaintiffs’ claims are not ripe for review. The harm to the plaintiffs caused by separation from their family members is imminent and concrete, and is not ameliorated by the hypothetical possibility that the plaintiffs might receive a discretionary waiver under Section 3(c) of the Second Executive Order at some point in the future.

. See Cent. Intelligence Agency, The World Factbook, Country Comparison: Population, https://www.cia.gov/library/publications/the-world-factbook/rankorder/2119rank.html (last visited May 19, 2017) (saved as ECF opinion attachment) (listing populations of the six identified countries, in the total amount of more than 180 million). Notably, the class of banned "nationals” potentially includes citizens of one of the six identified countries whether or not those citizens have ever been physically present in one of these countries. See Cent. Intelligence Agency, The World Factbook, Field Listing: Citizenship, https:// www.cia.gov/library/publications/the-world-factbook/fields/2263.html (last visited May 19, 2017) (saved as ECF opinion attachment).

. See Visa Waiver Program Improvement and Terrorist Travel Prevention Act of 2015, Pub. L. No. 114-113, § 203, 129 Stat. 2242, 2989-91; Department of Homeland Security, U.S. Customs and Border Protection-009 Electronic System for Travel Authorization System of Records, 81 Fed. Reg. 39,680, 39,682 (June 17, 2016).

. See U.S. Customs & Border Prot., Visa Waiver Program Improvement and Terrorist Travel Prevention Act Frequently Asked Questions, https://www.cbp.gov/travel/ intemational-visitors/visa-waiver-program/ visa-waiver-program-improvement-and-terrorist-travel-prevention-act-faq (last visited May 19, 2017) (saved as ECF opinion attachment).