**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WILLIAM ALEXANDER LEIVA-PEREZ,
                    *Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,
                    *Respondent.*

No. 09-71636

Agency No.
A094-773-199

ORDER AND
OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Filed April 1, 2011

Before: Kim McLane Wardlaw, Raymond C. Fisher and
Marsha S. Berzon, Circuit Judges.

Per Curiam Opinion

## COUNSEL

Richard Miyamoto, Phung, Miyamoto & Diaz, LLP, Los Angeles, California, and Salman Alam, Newport Beach, California, Appointed Pro Bono Amicus Curiae Counsel for the petitioner.

Tony West, Assistant Attorney General, Civil Division, Thomas B. Fatouros, Senior Litigation Counsel, Lynda Do and Karen Y. Stewart, Civil Division/Office of Immigration Litigation, Department of Justice, Washington, D.C., for the respondent.

**OPINION**

PER CURIAM:

William Alexander Leiva-Perez filed a petition for review of a decision of the Board of Immigration Appeals (BIA) denying his application for asylum, withholding of removal and relief under the United Nations Convention Against Torture (CAT). Along with his petition for review, Leiva-Perez filed a motion for a stay of removal. Pursuant to Ninth Circuit General Order 6.4(c)(1), Leiva-Perez's motion caused a temporary stay to issue. *See De Leon v. INS*, 115 F.3d 643, 644 (9th Cir. 1997). We hereby grant Leiva-Perez a stay of removal pending determination of his case on its merits and issue this opinion to clarify our standard for stays of removal in light of *Nken v. Holder*, 129 S. Ct. 1749 (2009).

## I.  Background

Before passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, div. C, 110 Stat. 3009-546, aliens appealing a decision of the BIA were generally entitled to an automatic stay of their orders of removal pending judicial review. *See* 8 U.S.C. § 1105a(a)(3) (repealed 1996). With IIRIRA, Congress eliminated the automatic stay provision, but left intact the authority of the courts of appeal to grant stays as a matter of discretion. *See* 8 U.S.C. § 1252(b)(3)(B) (2006); *see also Andreiu v. Ashcroft*, 253 F.3d 477, 480 (9th Cir. 2001) (en banc).

**[1]** Congress did not specify the standard that courts should apply in evaluating an alien's request to stay his removal pending our adjudication of his petition for review. In *Abbassi v. INS*, 143 F.3d 513 (9th Cir. 1998), we decided to apply "the same standards employed by district courts in evaluating motions for preliminary injunctive relief" to those

stay requests. *Id.* at 514. We explained that to justify a stay under that standard:

> Petitioner must show either a probability of success on the merits and the possibility of irreparable injury, or that serious legal questions are raised and the balance of hardships tips sharply in petitioner's favor. These standards represent the outer extremes of a continuum, with the relative hardships to the parties providing the critical element in determining at what point on the continuum a stay pending review is justified.

*Id.* (citations omitted). This "continuum" was essentially the same as the "sliding scale" approach we long applied to requests for preliminary injunctions, whereby "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

**[2]** The *Abbassi* formulation remained our standard for stays of removal until an aspect of it—its treatment of the irreparable harm factor—was rejected as too lenient in *Nken*. *Nken*'s principal holding was that stays of removal are governed by "the traditional test for stays," rather than 8 U.S.C. § 1252(f)'s higher standard for enjoining an alien's removal, but it also endeavored to clarify "what that [traditional stay] test is." 129 S. Ct. at 1760.[1]

*Nken* began by noting the four factors that have been considered when evaluating whether to issue a stay:

---

[1]Subsection 1252(f)(2) of Title 8 provides in full: "Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law."

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* at 1761 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (quotation marks omitted)). "The first two factors," *Nken* said, "are the most critical." *Id.*

**[3]** We will say more about each of these factors in a moment, but pause first to emphasize that while, as we develop later, *Nken* raised the minimum permissible showing of irreparable harm necessary to justify a stay of removal, it did not disturb the overall manner in which courts balance the various stay factors once they are established. *Nken* held that if the petitioner has not made a certain threshold showing regarding irreparable harm—and we discuss what that threshold is below—then a stay may not issue, regardless of the petitioner's proof regarding the other stay factors. *See Nken*, 129 S. Ct. at 1760-61. Our precedent varied from *Nken* as to the irreparable harm threshold, but not as to the bedrock requirement that stays must be denied to all petitioners who did not meet the applicable irreparable harm threshold, regardless of their showing on the other stay factors. *See Abbassi*, 143 F.3d at 514. By the same token, even certainty of irreparable harm has never *entitled* one to a stay. *See Nken*, 129 S. Ct. at 1760 ("A stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion. . . ." (citation and quotation marks omitted)). In short, a proper showing regarding irreparable harm was, and remains, a necessary but not sufficient condition for the exercise of judicial discretion to issue a stay.

Aside from raising the irreparable harm threshold, *Nken* did not directly address the common practice of courts to balance the relative equities of the stay factors. We find it significant,

though, that *Nken* twice invoked *Hilton* as stating the "traditional" test for stays, and that *Hilton* endorsed the same balancing approach sanctioned by *Abbassi*. *See Nken*, 129 S. Ct. at 1756 (citing *Hilton* as setting forth the "traditional" test for stays); *id.* at 1760 (same).

*Hilton* considered the circumstances under which a federal court of appeals should stay the issuance of a writ of habeas corpus following the district court's granting of the writ, thereby maintaining the petitioner's custodial detention pending the resolution of the state's appeal. After noting the various interests of the state and the petitioner that the court could take into consideration in adjudicating the stay request, *Hilton* explained that the balance of the relative equities "may depend to a large extent upon determination of the State's prospects of success in its appeal." 481 U.S. at 778.

> Where the State establishes that it has a strong likelihood of success on appeal, or where, failing that, it can nonetheless demonstrate a substantial case on the merits, continued custody is permissible if the second and fourth factors in the traditional stay analysis militate against release. Where the State's showing on the merits falls below this level, the preference for release should control.

*Id.* (citations omitted). We take *Nken*'s endorsement of *Hilton* as an indication that we should continue to employ the type of "continuum" articulated in *Abbassi*, albeit with a few refinements discussed below.

Further, in a closely analogous situation—a request for a stay pending the filing and disposition of a petition for a writ of certiorari—the Supreme Court recently emphasized the use of a flexible approach bearing a strong resemblance to the *Abbassi* continuum. *See Hollingsworth v. Perry*, 130 S. Ct. 705, 710 (2010) (per curiam) ("In close cases the Circuit Justice or the Court will balance the equities and weigh the rela-

tive harms to the applicant and to the respondent."); *see also Ind. State Police Pension Trust v. Chrysler LLC*, 129 S. Ct. 2275, 2276 (2009) (per curiam) (same).

We note, too, that a panel of our court recently reached a similar conclusion to ours as to the effect of recent Supreme Court cases—in particular, *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365 (2008)—on the continuing viability of the "sliding scale" approach to preliminary injunctions. *See Wild Rockies*, 632 F.3d at 1131-32. *Wild Rockies* held that although *Winter* had raised the bar on what must be shown on the irreparable harm prong to justify a preliminary injunction, it did not alter our authority to balance the elements of the preliminary injunction test, so long as a certain threshold showing is made on each factor. *See id.* ("[W]e hold that the 'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test. In other words, 'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met."). Although there are important differences between a preliminary injunction and a stay pending review, discussed at length in *Nken*, *see* 129 S. Ct. at 1756-59, we do not believe they would support a balancing approach for preliminary injunctions but not stays.

If anything, a flexible approach is even *more* appropriate in the stay context. Whereas "the extraordinary remedy of injunction" is the means by which a court "directs the conduct of a party . . . with the backing of its full coercive powers," a stay operates only "upon the judicial proceeding itself . . . . either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability." *Id.* at 1757-58 (quotation marks omitted). In other words, although "[a] stay pending appeal certainly has some functional overlap with an injunction," *id.* at 1758, stays are typically less coercive and less disruptive than are injunctions. *See id.* ("An alien seeking a stay of removal pending adjudi-

cation of a petition for review does not ask for a coercive order against the Government, but rather for the temporary setting aside of the source of the Government's authority to remove.").

**[4]** We therefore conclude that the general balancing approach used in *Abbassi* remains in place, and move on to consider whether and—if so, *how—Nken* affects the individual elements to be balanced.

## II.   Likelihood of Success on the Merits

**[5]** The first showing a stay petitioner must make is "a strong showing that he is likely to succeed on the merits." *Id.* at 1761 (quoting *Hilton*, 481 U.S. at 776) (quotation marks omitted). There is some uncertainty as to the exact degree of likely success that stay petitioners must show, due principally to the fact that courts routinely use different formulations to describe this element of the stay test. *See Mohammed v. Reno*, 309 F.3d 95, 100-02 (2d Cir. 2002) (collecting cases). What is clear, however, is that to justify a stay, petitioners need not demonstrate that it is more likely than not that they will win on the merits.

**[6]**   As the Second Circuit has noted, *Nken* "did not suggest that this factor requires a showing that the movant is 'more likely than not' to succeed on the merits." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 37 (2d Cir. 2010). Indeed, the case from which *Nken* takes the stay standard, *Hilton*, permitted a stay to issue upon "demonstrat[ion] [of] a substantial case on the merits," so long as the other factors support the stay. *Hilton*, 481 U.S. at 778. With regard to the likelihood of success factor, *Nken* said only that "[i]t is not enough that the chance of success on the merits be 'better than negligible,' " and that "[m]ore than a mere 'possibility' of relief is required." 129 S. Ct. at 1761 (citations omitted). Insofar as we have long required more on the "likelihood of success" factor than what *Nken* rejected, we

do not believe *Nken* changed that aspect of the *Abbassi* formulation. *See Abbassi*, 143 F.3d at 514 (requiring a stay petitioner to show either "a probability of success on the merits" or that "serious legal questions are raised," depending on the strength of the petitioner's showing on the other stay factors).

We find additional evidence that this stay factor does not require the moving party to show that her ultimate success is probable from other post-*Nken* opinions. In an opinion released several months after *Nken*, Justice Breyer, sitting as a Circuit Justice, explained that "whether the stay applicant has made a strong showing that he is likely to succeed on the merits" means, in the context of a stay pending a petition for writ of certiorari, "that it is *reasonably likely* that four Justices of this Court will vote to grant the petition for writ of certiorari, and that, if they do so vote, there is a *fair prospect* that a majority of the Court will conclude that the decision below was erroneous." *O'Brien v. O'Laughlin*, 130 S. Ct. 5, 6 (2009) (Breyer, in chambers) (citing *Hilton*, 481 U.S. at 776) (emphases added). A few months later in *Hollingsworth*, the full Supreme Court used similar language, but replaced "reasonably likely" with "a reasonable probability." 130 S. Ct. at 710. Likewise, in the preliminary injunction context, this circuit has held that so long as other requirements are met, "serious questions going to the merits . . . can support issuance of a preliminary injunction." *Wild Rockies*, 632 F.3d at 1135.

Such a rule, moreover, makes good sense. A more stringent requirement would either, in essence, put every case in which a stay is requested on an expedited schedule, with the parties required to brief the merits of the case in depth for stay purposes, or would have the court attempting to predict with accuracy the resolution of often-thorny legal issues without adequate briefing and argument. Such pre-adjudication adjudication would defeat the purpose of a stay, which is to give the reviewing court the time to "act responsibly," rather than doling out "justice on the fly." *Nken*, 129 S. Ct. at 1757. As the Court said in *Nken*, "[t]he whole idea is to hold the matter

under review in abeyance because the appellate court lacks sufficient time to decide the merits." *Id.* at 1760; *see also Wild Rockies*, 632 F.3d at 1140 (Mosman, D.J., concurring) ("In this setting, it can seem almost inimical to good judging to hazard a prediction about which side is likely to succeed."); *Mohammed*, 309 F.3d at 102 (holding that a stay of removal may issue even when the alien's chance of ultimate success is less than 50 percent because, "[i]f the likelihood were more than 50 percent, the appellant would be required to persuade the stay panel that he was more likely than not to win the appeal before the merits panel, just to obtain the critical opportunity to maintain the status quo until the merits panel considers the appeal").

   **[7]** There are many ways to articulate the minimum quantum of likely success necessary to justify a stay—be it a "reasonable probability" or "fair prospect," as *Hollingsworth*, 130 S. Ct. at 710, suggests; "a substantial case on the merits," in *Hilton*'s words, 481 U.S. at 778; or, as articulated in *Abbassi*, 143 F.3d at 514, that "serious legal questions are raised."[2] We think these formulations are essentially interchangeable, and that none of them demand a showing that success is more likely than not. Regardless of how one expresses the requirement, the idea is that in order to justify a stay, a petitioner must show, at a minimum, that she has a substantial case for relief on the merits.

## III.   Irreparable Harm

   **[8]** While *Nken* did not affect *Abbassi*'s likelihood of success prong, it did overrule that part of *Abbassi* that permitted

---

   [2]*See also, e.g.*, *Bush v. Gore*, 531 U.S. 1046, 1046 (2000) (Scalia, J., concurring) ("a substantial probability of success"); *Kenyeres v. Ashcroft*, 538 U.S. 1301, 1306 (2003) (Kennedy, J., in chambers) ("a reasonable likelihood"); *Mori v. Int'l Bhd. of Boilermakers*, 454 U.S. 1301, 1303 (1981) (Rehnquist, J., in chambers) ("a reasonable probability of success on the merits").

a stay to issue upon the petitioner "simply showing some '*possibility* of irreparable injury.' " *Nken*, 129 S. Ct. at 1761 (quoting *Abbassi*, 143 F.3d at 514) (emphasis added). Although *Nken* did not say what ought to replace *Abbassi*'s "possibility" standard, it quoted *Winter* for the proposition that the " 'possibility' standard is too lenient." *Id.* (quoting *Winter*, 129 S. Ct. at 375). *Winter*, in turn, was clear in holding that "plaintiffs seeking preliminary relief [are required] to demonstrate that irreparable injury is *likely* in the absence of an injunction." 129 S. Ct. at 375 (emphasis in original).

**[9]** We read *Nken*'s reference to *Winter* in this context as indicating that to obtain a stay of removal, an alien must demonstrate that irreparable harm is *probable* if the stay is not granted. In other words, an alien's burden with regard to irreparable harm is higher than it is on the likelihood of success prong, as she must show that an irreparable injury is the more probable or likely outcome. *Cf. Wild Rockies*, 632 F.3d at 1131-32 (reaching the same conclusion in the preliminary injunction context).

*Nken* did not make explicit this differential treatment of the level of irreparable harm and likelihood of success on the merits, but there is support for it in the text of the traditional stay test. Whereas the question on the irreparable harm stay factor is "whether the applicant *will be* irreparably injured absent a stay," the first stay factor asks "whether the stay applicant *has made a strong showing that he is likely* to succeed on the merits." *Nken*, 129 S. Ct. at 1761 (emphases added). The former inquiry asks what *will* happen, while the latter asks, in essence, whether the stay petitioner has made a strong argument on which he could win. We have already explained why, on a stay application, a court often cannot reasonably determine whether the petitioner is more likely than not to win on the merits, but typically it is easier to anticipate what would happen as a practical matter following the denial of a stay. As the *Wild Rockies* concurrence pointed out in the preliminary injunction context:

> While the Supreme Court [in *Winter*] cabined th[e] flexibility [of the sliding scale approach] with regard to the likelihood of harm, there are good reasons to treat the likelihood of success differently. As between the two, a district court at the preliminary injunction stage is in a much better position to predict the likelihood of harm than the likelihood of success. In fact, it is not unusual for the parties to be in rough agreement about what will follow a denial of injunctive relief.

*Wild Rockies*, 632 F.3d at 1139 (Mosman, D.J., concurring).

In addition to rejecting our "possibility" standard, *Nken* emphasized the individualized nature of the irreparable harm inquiry. *See Nken*, 129 S. Ct. 1760-61; *see also Hilton*, 481 U.S. at 777 ("[T]he traditional stay factors contemplate individualized judgments in each case."). In particular, *Nken* held that "[a]lthough removal is a serious burden for many aliens, it is not categorically irreparable." 129 S. Ct. at 1761.

Before IIRIRA, noncitizens were not permitted to pursue petitions for review once they had left (or were removed from) the United States because "the petition abated upon removal." *Id.* Therefore, the pre-IIRIRA automatic stay provision "reflected a recognition of the irreparable nature of harm" caused by removal: a noncitizens's removal prevented her from obtaining judicial review. *Id.* With IIRIRA, however, Congress permitted noncitizens to pursue their petitions for review even post-removal, "and those who prevail can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal." *Id.* Because Congress eliminated the source of categorical irreparable harm—the prohibition on pursuing petitions for review from abroad—Congress also did away with the automatic stay.

**[10]** For the same reason, *Nken* explained, we can no longer assume that "the burden of removal alone . . . constitute[s]

the requisite irreparable injury." *Id.* Instead, a noncitizen must show that there is a reason specific to his or her case, as opposed to a reason that would apply equally well to all aliens and all cases, that removal would inflict irreparable harm—for example, that removal would effectively prevent her from pursuing her petition for review, or that, even if she prevails, she could not be afforded effective relief. *See id.*; *see also, e.g.*, *Desta v. Ashcroft*, 365 F.3d 741, 748 (9th Cir. 2004) ("If Desta or others like him are required to return to their countries of origin while they petition for review by this court, they may not be able to return to this country even if they are eventually successful on the merits of their petitions.")

In asylum, withholding of removal and CAT cases, the claim on the merits is that the individual is in physical danger if returned to his or her home country. Consideration of the likelihood of such treatment, determined apart from merits issues such as whether any physical abuse would be on account of a protected ground for asylum and withholding purposes, or whether the alien is barred from relief as a criminal alien, should be part of the irreparable harm inquiry. *See Kenyeres v. Ashcroft*, 538 U.S. 1301, 1305 (2003) (Kennedy, J., in chambers) ("An opportunity to present one's meritorious grievances to a court supports the legitimacy and public acceptance of a statutory regime. It is particularly so in the immigration context, where seekers of asylum and refugees from persecution expect to be treated in accordance with the rule-of-law principles often absent in the countries they have escaped. A standard that is excessively stringent may impede access to the courts in meritorious cases.").[3] In addition, as we have previously held, "[o]ther important [irreparable harm] factors include separation from family members, medical needs, and potential economic hardship." *Andreiu v. Ashcroft*, 253 F.3d 477, 484 (9th Cir. 2001) (en banc).

---

[3]The merits questions would, of course, be pertinent to the independent likelihood of success factor.

We do not intend the examples provided here to be an exhaustive treatment of the ways in which an alien can demonstrate irreparable harm. Indeed, in light of the individualized consideration stay requests are to be afforded, such a treatment would be impossible.

## IV.   Public Interest

**[11]** As for the third and fourth factors—assessing how a stay would affect the opposing party and the interest of the public—they merge where, as is the case here, the government is the opposing party. *See Nken*, 129 S. Ct. at 1762. Here, too, *Nken* emphasized that we are to consider the particulars of each individual case, and may not "simply assume that '[o]rdinarily, the balance of hardships will weigh heavily in the applicant's favor.' " *Id.* (quoting *Andreiu*, 253 F.3d at 484) (alteration in original). While we consider the "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm," we are also mindful of the fact that there is also a public interest "in prompt execution of removal orders," which "may be heightened" in certain circumstances, such as those involving "particularly dangerous" noncitizens. *Id.*

We emphasize that although petitioners have the ultimate burden of justifying a stay of removal, the government is obliged to bring circumstances concerning the public interest to the attention of the court. *Nken*'s admonition that we cannot base stay decisions on assumptions and "blithe assertion[s]," *id.*, applies with equal force to the government's contentions in opposing stay requests. The relevant circumstances would include any reason to believe that the petitioner would not in fact be removed were the stay denied.

**[12]** In sum, and for the sake of clarity, we hold that in light of *Nken*'s impact on our prior precedent, a petitioner seeking a stay of removal must show that irreparable harm is probable and either: (a) a strong likelihood of success on the

merits and that the public interest does not weigh heavily against a stay; or (b) a substantial case on the merits and that the balance of hardships tips sharply in the petitioner's favor. As has long been the case, "[t]hese standards represent the outer extremes of a continuum, with the relative hardships to the parties providing the critical element in determining at what point on the continuum a stay pending review is justified." *Abbassi*, 143 F.3d at 514.

## V. Application

With these precepts in mind, we turn to Leiva-Perez's particular case. We hold that a stay of removal is warranted.

**[13]** First, Leiva-Perez has demonstrated that he is likely to suffer irreparable harm if returned to his home country, El Salvador. Leiva-Perez testified before the IJ, who found Leiva-Perez credible, that he was personally targeted for extortion and savage beatings by a particular group of individuals affiliated with the Farabundo Martí National Liberation Front ("FMLN"), a political party. These actions, if carried out after removal, would certainly constitute irreparable harm. Leiva-Perez's testimony indicated that the extortion and beatings are indeed likely to recur if he is forced to return to El Salvador. Accordingly, Leiva-Perez has made a sufficient showing that irreparable harm is probable, absent a stay.

He has also demonstrated a sufficiently strong likelihood of success on the merits. The BIA's sole reason for dismissing Leiva-Perez's asylum appeal was that he had failed to establish a nexus between the persecution he has suffered and his claimed protected ground, political opinion. *See Soriano v. Holder*, 569 F.3d 1162, 1164 (9th Cir. 2009). Because Leiva-Perez filed his application after the REAL ID Act went into effect, he must demonstrate that his political opinion was "one central reason" why he was personally targeted for persecution. *See Parussimova v. Mukasey*, 555 F.3d 734, 740-41 (9th Cir. 2009).

**[14]** The IJ stated that the beatings and extortion Leiva-Perez suffered were not on account of his political opinion because they were simply "criminal matters." The BIA seemingly agreed, suggesting that Leiva-Perez had merely "a general fear of crime and violence." "[A] generalized or random possibility of persecution" is, of course, insufficient to support an asylum claim. *Singh v. INS*, 134 F.3d 962, 967 (9th Cir. 1998) (quotation marks omitted). But that does not mean that where, as may be the case here, the persecutors were motivated by an economic or other criminal motive *in addition to* a protected ground, the petitioner cannot show a nexus. As we held in *Parussimova*, "an asylum applicant need not prove that a protected ground was the only central reason for the persecution she suffered," as "a persecutory act may have multiple causes." 555 F.3d at 740. Moreover, "an applicant need not prove that a protected ground was the most important reason why the persecution occurred." *Id.* Although we emphasize that our review is preliminary at this point, Leiva-Perez has a substantial case—a case which raises serious legal questions, or has a reasonable probability or fair prospect of success—that the BIA erred in requiring more of a nexus than is warranted under *Parussimova*. He has therefore made a sufficiently strong showing of likely success on the merits.

**[15]** As for the final two factors of the stay analysis, Leiva-Perez argues that the relative equities weigh heavily in his favor, based principally on the public's interest in ensuring that we do not deliver aliens into the hands of their persecutors and the fact that he is not currently detained, and therefore the government is incurring no expense while he seeks judicial review. The government has made no arguments to the contrary, nor any showing as to whether the Department of Homeland Security will actually take steps to remove Leiva-Perez relatively soon if the stay is denied. On these facts, the public interest weighs in favor of a stay of removal.

**[16]** In sum, Leiva-Perez has demonstrated that irreparable harm is probable absent a stay, that he has a substantial case

on the merits and that the balance of hardships tips sharply in his favor. Accordingly, his request for a stay pending review of his petition for review is granted.

## VI. Conclusion

Insofar as *Abbassi* and its progeny permitted noncitizens to obtain a stay of removal pending adjudication of their petitions for review upon showing that irreparable harm was anything less than probable, those cases were overruled by *Nken*. That said, so long as the alien has made the threshold showing that irreparable harm is probable absent a stay, we continue to weigh the relative equities along the *Abbassi* "continuum," delineated on one end by a showing of a strong likelihood of success on the merits and that the public interest does not weigh heavily against a stay; and, on the other end, by a showing of a substantial case on the merits and that the balance of hardships tips sharply in favor of a stay. Because Leiva-Perez has met his burden as to each factor and the overall balance tips in his favor, we grant his motion for a stay of removal pending the resolution of his petition for review.

**STAY GRANTED.**