THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE
*1201 This matter is before the Court on the Court's Order to Show Cause Why a Preliminary Injunction Should Not Issue. Defendants Alliance Document Preparation ("Alliance"), SBS Capital Group, Inc. ("SBS"), First Student Aid, LLC ("First Student"), (collectively, "Corporate Defendants"), Benjamin Naderi (collectively, with Corporate Defendants, "Defendants"), and Relief Defendants Direct Consulting Group, LLC ("Direct"), and Capital Doc Prep, LLC ("Capital") (collectively, "Relief Defendants") opposed the entry of a preliminary injunction ("Opposition") on October 18, 2017. Plaintiff's replied on October 23, 2017 ("Reply"). The Court read and considered the papers and held a hearing on the Order to Show Cause on November 1, 2017. For the following reasons, the Order to Show Cause is discharged and the requested preliminary injunction shall issue.
I. FACTUAL AND PROCEDURAL BACKGROUND
On September 27, 2017, the Federal Trade Commission filed the instant action alleging violation of both Section Five of the Federal Trade Commission Act and the Telemarketing Sales Rule. Defendants are a group of several corporations and individuals, all engaged in the business of student loan debt relief and all sharing some combination of ownership, office space, or resources. Plaintiff contends that they constitute a common enterprise controlled by the Individual Defendants.
In its Complaint, the FTC alleges the following: Defendants engaged in the deceptive marketing and sale of student loan debt relief services. (Compl. ¶ 1.) Targeting alumni of for-profit colleges, Defendants falsely advertised that they are able to obtain reduced monthly student loan payments or loan forgiveness for consumers. (Compl. ¶ 25.) In actuality, they charged indebted students substantial upfront fees and filled out loan forms freely available from the United States Department of Education. (Compl. ¶¶ 26,39.) In most instances, debtors receive neither reduced payments nor loan forgiveness and in some cases were left in a worse position after doing business with Defendants. (Compl. ¶ 40.)
On the same day it filed the Complaint, Plaintiff filed an ex parte Application for a Temporary Restraining Order including an asset freeze and the appointment of a Temporary Receiver. (Ex Parte Application, ECF No. 6.) On September 29, 2017, the Court granted Plaintiff's application and entered a Temporary Restraining Order. (Temporary Restraining Order "TRO," ECF No. 18.) The TRO temporarily enjoined Defendants from (1) making representations prohibited by Section 5 of the FTC Act; (2) making representations prohibited by the Telemarketing Sales Rule; (3) releasing customer information; and (4) destroying or otherwise making unavailable documents relevant to the litigation. (See generally , TRO.) The TRO
*1202 also froze all assets owned or controlled by Defendants and ordered each to disclose any additional assets and to repatriate any assets held in foreign jurisdictions. (See generally , TRO.) Finally, the TRO also appointed Thomas W. McNamara as a Temporary Receiver, providing him immediate access to Defendants business properties and ordering him to prepare a detailed report on Defendants' business practices and financial activities. The Temporary Receiver was also charged with managing Defendants' businesses and assessing whether they can be operated lawfully and profitably. (See generally , TRO.)
In the TRO, the Court also ordered Defendants and Relief Defendants to show cause why the Court should not enter a preliminary injunction. On October 4, 2017, the Temporary Receiver filed a preliminary report with the Court. (Preliminary Report of Temporary Receiver "Preliminary Report," ECF No. 24.) In this report, the Temporary Receiver described the steps taken to secure Defendants' business premises and provided feedback on the materials found there as well as Defendants business practices and financial activities. That same day, the parties appeared before the Court to address the TRO and potential preliminary injunction. On request of the parties, the Court ordered a continuance of the preliminary injunction hearing until November 1, 2017.
Over the course of the following weeks, the FTC stipulated to preliminary injunctions with three of the Corporate Defendants and five of the Individual Defendants. (ECF Nos. 66, 67, 68, 77) The remaining Defendants are Benjamin Naderi along with the Corporate Defendants and Relief Defendants under his control. On October 18, 2017, these Defendants filed their Opposition to Plaintiff's Motion. (Opposition, ECF No. 40.) The same day, Defendants filed an ex parte application seeking live testimony at the preliminary injunction hearing and requesting leave of the Court to file a supplemental opposition to Plaintiff's motion for preliminary injunction. (ECF No. 44.) The Court denied the request for live testimony and granted the request for leave to file a supplemental opposition. (Order, ECF No. 76.) In light of the denial of live testimony, Defendants requested leave of the Court to file a surreply arguing that it should be permitted to address new facts and evidence presented in Plaintiff's reply brief. (Ex Parte Application for Leave to File Surreply and Supplemental Declaration of B. Naderi, ECF No. 79.) On November 1, 2017, the Court held a hearing considering the propriety of entering a preliminary injunction.
For the reasons detailed below, the Court issues a preliminary injunction against Defendants Alliance Document Preparation, LLC, SBS Capital Group, Inc., First Student Aid, LLC, Elite Consulting Services, LLC, Elite Doc Prep, LLC, Benjamin Naderi, and Relief Defendants Direct Consulting Group, LLC and Capital Doc Prep, LLC. The Court also extends the asset freeze and temporary receivership for the same Defendants. This preliminary injunction shall not apply to SBB Holdings, LLC, United Legal Center, LLC, United Legal Center, Inc., Grads Doc Prep, LLC, Shawn Gabbaie, Avinadav Rubeni, Michael Ratliff, Farzan Azinkhan, or Ramiar Reuveni. All of these Defendants are bound by stipulated preliminary injunctions approved by the Court on October 24, 2017 and October 27, 2017. (ECF Nos. 66, 67, 68, and 77.)
II. LEGAL STANDARD
Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is *1203 entitled to such relief." Winter v. Nat'l Res. Def. Council, Inc. , 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). "A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." Toyo Tire Holdings of Americas Inc. v. Continental Tire N. Am., Inc. , 609 F.3d 975, 982 (9th Cir. 2010) (citing Winter , 555 U.S. at 7, 129 S.Ct. 365 ). When the FTC seeks an injunction, it need only show that two of these factors are satisfied: (1) that it is likely to succeed on the merits and (2) that the balance of equities weigh in favor of an injunction. F.T.C. v. Affordable Media , 179 F.3d 1228, 1233 (9th Cir. 1999).
To grant preliminary injunctive relief, a court must find that "a certain threshold showing is made on each factor." Leiva-Perez v. Holder , 640 F.3d 962, 966 (9th Cir. 2011). In so doing, the Court may rely on evidence that is not in a format that would be admissible at trial. Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc. , 736 F.3d 1239, 1250 (9th Cir. 2013) ("Due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings.")
III. FINDINGS OF FACT & CONCLUSIONS OF LAW
A. Defendants Constitute a Common Enterprise
"[E]ntities constitute a common enterprise when they exhibit either vertical or horizontal commonality-qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." F.T.C. v. Network Servs. Depot , Inc. , 617 F.3d 1127, 1142-43 (9th Cir. 2010). Courts are permitted to consider a variety of factors when deciding whether a common enterprise exists. For instance, courts may consider whether companies are under common ownership and control; whether they pool resources and staff; whether they share telephone numbers, employees, and email systems; and whether they jointly participated in a shared business venture or referred customers to one another. Id. at 1143.
It is the conclusion of the Court, based on the evidence and on the report of the Temporary Receiver, that each of these factors indicate the Corporate Defendants constitute a common enterprise under control and direction of the Individual Defendants.
As an initial matter, the Court finds that the Corporate entities are under common ownership, management, and control. Four of the Corporate Defendants and both of the Corporate Defendants are owned, at least in part, by Benjaim Naderi. (Compl. ¶¶ 15-20.) They also share common office space, with all but two operating out of 1435 S. La Cienega Blvd. (Compl. ¶¶ 6-14.) At this location, the Temporary Receiver found that the companies shared not only office space, but also employees, including a common administrator, Erika Alta, who maintained an office on the second floor of the building. (Preliminary Report 11.) The only Corporate Defendants not operating out of this office space, GDP and SBS, are owned, at least in part, by Individual Defendants Benjamin Naderi and Shawn Gabbaie, both of whom own and operate multiple of the other Corporate Defendants. (Compl. ¶¶ 6-20.)
The Court also finds that the Corporate Defendants were jointly engaged in a common venture. All existed as student loan *1204 relief operators selling the same services and utilizing the same techniques-in many cases sharing forms and scripts. (Preliminary Report 11.) They shared the same cloud services, hosting services, and phone services. (Preliminary Report 11.) Furthermore, they freely shared substantial funds among one another. (Preliminary Report 11; Supplemental Report.)
"Where corporate entities operate together as a common enterprise, each may be held liable for the deceptive acts and practices of the others." F.T.C. v. Grant Connect, LLC, 763 F.3d 1094, 1105 (9th Cir. 2014.) As a result, each of the Corporate Defendants is jointly and severally liable for the acts and practices of the common enterprise.
B. Only Federal Student Loan Servicers Can Approve Borrowers for Federal Student Loan Programs
The Department of Education is the exclusive administrator of repayment and debt relief plans available to federal student loan borrowers. (Declaration of Benjamin Lee "Lee Decl." PX 31 ¶ 3, ECF No. 9-1.)[1] It provides a limited number of programs that offer student loan forgiveness or discharge. (Lee Decl. ¶ 3.) Only the loan servicers approved by the Department of Education are permitted to determine eligibility or approve borrowers for enrollment in payment plans or other federal student loan programs. (Lee Decl. ¶ 3.)
Some of the most common discharge programs administered by the Department of Education are the Public Service Loan Forgiveness ("PSLF"), Teacher Loan Forgiveness ("TLF"), and Borrower Defense to Repayment ("BDR"). All of these programs have strict eligibility requirements. (Lee Decl. ¶ 4.) BDR, for instance, is available only if: (1) the loan was made by the school or a school affiliated organization; (2) the lender who made the loan provided an improper inducement ... to the school or any other party in connection with the making of the loan; (3) the school refers borrowers to the lender; or (4) the school is affiliated with the lender by common control, contract, or business arrangement. 34 C.F.R. 682.209(g). Because the Department of Education has not yet adopted regulations establishing criteria for processing or evaluating BDR applications[2] , it is difficult, even for experts, to determine what qualifies for BDR. (Lee Decl. ¶ 4.) PSLF is similarly restrictive and is only available to government employees and employees of non-profit organizations who make timely monthly payments for ten (10) years under a qualifying repayment plan. (Lee Decl. ¶ 7.) At the end of those ten years, any remaining balance of their loans is discharged. (Lee Decl. ¶ 7.) Borrowers must remain eligible for the program for the entire 10 years period. (Lee Decl. ¶ 7.)
Other common forms of loan forgiveness are the income-driven repayment (IDR) programs. (Lee Decl. ¶ 8.) The qualification requirements vary from plan to plan, but each requires a minimum of 20 or 25 years of payments. (Lee Decl. ¶ 8.) After the required payment period, any remaining balance is theoretically discharged.[3] (Lee Decl. ¶ 8.)
*1205 Borrowers are able to apply for forbearance, deferment, IDR, loan forgiveness and discharge programs online and by mail through their loan servicer at no cost. (Lee Decl. ¶ 3.) All federally approved loan servicers can and will discuss these various options in depth whenever a borrower calls. (Lee Decl. ¶ 3.)
C. The FTC Is Likely to Succeed on the Merits of Its Claims
The burden lies on the FTC to demonstrate that it is likely to prevail on its claims that Defendants violated Section 5 of the FTC Act and the Telemarketing Sales Rule ("TSR" or "Rule") as described in 16 C.F.R. § 310.4(a)(5)(I). Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal , 546 U.S. 418, 429, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006) ("[T]he burdens at the preliminary injunction stage track the burdens at trial.") In the preliminary injunction context, the Ninth Circuit holds that so long as the other preliminary injunction requirements are met, "serious questions going to the merits ... can support issuance of a preliminary injunction." Leiva-Perez , 640 F.3d at 967 (quoting Alliance for the Wild Rockies , 632 F.3d 1127, 1135 (9th Cir. 2011) ).
The Court finds that the FTC has demonstrated a substantial likelihood of succeeding on the merits of its claims and has therefore satisfied its burden. The Court examines each of Plaintiff's claims below.
1. Violations of Section 5 of the FTC Act
Section 5 of the Federal Trade Commission Act ("FTC Act") prohibits "unfair or deceptive acts or practices in or affecting commerce." ( 15 U.S.C. § 45(a)(1).) "An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.' " F.T.C. v. Stefanchik , 559 F.3d 924, 928 (9th Cir. 2009) (quoting F.T.C. v. Gill , 265 F.3d 944, 950 (9th Cir. 2001) ) The Court considers the overall 'net impression' that Defendants' representations make upon consumers." F.T.C. v. Cyberspace.com, LLC , 453 F.3d 1196, 1200 (9th Cir. 2006). A material representation is one that "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." Id. at 1201.
The Court finds that the FTC has met its burden of demonstrating likelihood of success on the merits. It has done so in three ways. First, it has demonstrated that Defendants falsely claim to qualify or approve consumers for federal student loan forgiveness or discharge programs. Second, it has shown that Defendants intentionally misled consumers, whether through direct statements or through implication, to believe that Defendants were associated with the Department of Education, the Federal Government, or with consumer's existing student loan servicers. Finally, the FTC has shown that Defendants falsely claim to permanently lower monthly payments or interest rates. Each of these findings are sufficient to establish a violation of Section 5 of the FTC Act.
a. Defendants Misled Consumers Regarding Their Ability to Qualify Borrowers for Federal Repayment or Discharge Programs
The Complaint alleges that Defendants misled consumers to believe that they "are qualified for, or are approved to receive loan forgiveness or other programs that will permanently lower or eliminate their loan payments or balances." (Compl. ¶ 43.)
*1206 As discussed above, Defendants have no authority to determine whether or not a consumer is qualified or approved for enrollment in any federal student loan program. (Lee Decl. ¶ 3.) Despite this, Defendants repeatedly told consumers that they were "qualified" or "approved" for certain programs. (See e.g. , PX 4 ¶ 2; PX 5 ¶ 5; PX 36 1362:1-6; Declaration of Tina E. Kondo "Kondo Declaration," Attach. A1, ECF No. 52.) In some instances, they used even stronger language: "It has already been 100% confirmed that you qualify and we are minutes away from generating your enrollment contract." (Kondo Decl., Attach. I.) Further misleading consumers, Defendants make frequent use of the pronoun "we" when discussing approval for a program, creating the false impression they themselves are enrolling consumers in federal programs. (See e.g. , PX 12 ¶ 3; PX 20 ¶ 3.) In other instances, Defendants referred to "underwriters" and led consumers to believe that Defendants themselves would take on the loan or that the loan would be transferred directly to the federal government. (See e.g. , PX 10 ¶ 3; PX 11 ¶ 3; Kondo Decl., Attach A1.)
Defendants also engaged in deceptive practices by informing consumers who clearly did not qualify for such programs that they were eligible for relief; for instance, one of Defendants' agents told a consumer that he qualified for partial loan forgiveness whereby he would have a 0% interest rate and his loans would be forgiven in full after 10 years. (PX 11 ¶ 3.) This statement was deceptive for two reasons: (1) the federal government does not provide a loan forgiveness program with a 0% interest rate, and (2) the only loan forgiveness program with a ten year term is the PSLF program for which the consumer did not qualify because he did not work in the public sector. (PX 11 ¶ 3.) In a similar instance, Defendants' agent told a debtor that she was qualified for PSLF because she had at one time worked as an EMT, despite no longer working in the public sector. (PX 9 ¶ 4.)
In reality, Defendants neither qualify nor enroll consumers. Rather, they gather the login information for the borrower's student loan account, consolidate the loans, then place them into forbearance-what they refer to as an "administrative hold-halting the borrower's payments, but nonetheless permitting interest to accrue despite assertions to the contrary.[4] (PX 1 112, 117, 120; PX 33 1293:10-15.) Only once the borrower has paid Defendants in full do they fill out the paperwork to switch to a different repayment plan or enroll in a forgiveness program. (PX 33 1293:10-15.) It is only then that the consumer finds out if they truly qualified for the program advertised by Defendants. Many consumers are upset to learn that this can be easily done for free by the borrower herself.[5] (PX 1 112, 113, 114, 115; PX 8 ¶ 3.; PX 9 ¶ 8.)
Even if a borrower is aware of the ability to freely enroll in the Department of Education's programs, Defendants attempt to dissuade them from doing so by severely overstating the difficulty of the application process-for instance claiming that *1207 "[i]t's about a three-inch stack of paperwork that's required...[i]f you do something wrong, it will put you in a ... potentially bad situation for the next 20 years." (PX 32 1261:17-22.) They further imply that it is difficult or impossible for consumers to change their repayment plan once they have committed to one of the plans offered by the Department of Education. In reality, a debtor may at any time enroll in any of the plans for which she qualifies. (Lee Decl. ¶ 4.)
Another of Defendants' deceptive practices relates to the federal government's BDR program. As discussed above, only a narrow subset of students qualify for this program and, with the uncertainty surrounding the Borrower Defense Rule, it is nearly impossible to determine what constitutes a successful BDR claim. Section III.B Supra. Despite the uncertainty of the approval process and the small number who qualify, Defendants pushed many consumers to apply, sometimes misrepresenting the borrower's likelihood of success.[6] As demonstrated by the document entitled "Rules of the Game" recovered by the Temporary Receiver, Defendants looked for any excuse to pitch the option. (Preliminary Report, Exh. 8.) "After you get their school, ask their [sic] experience was. If they didn't like the experience, go into asking them the golden questions. If they liked the school, see if they like the lender....[o]nly one answer qualifies them..." (Preliminary Report, Exh. 8.) The document also instructs agents to "[t]ell them they are 100% qualified if you must" and do not "mention 'Borrower Defense' for any reason." (Preliminary Report, Exh. 8.)
b. Defendants Falsely Stated or Implied Affiliation with the Department of Education
Plaintiff alleges that Defendants deceive customers by stating or implying that they are in some way affiliated with the government, the Department of Education, or the student loan servicers. (Compl. ¶ 43.) This claim is supported by numerous consumer complaints stating that Defendants created the false impression they were associated with the government in some capacity.[7] One handwritten note found at the worksite reminded the agents to "Never Say ... 'We work directly with DOE' say 'We work in ALLIANCE with DOE." (Kondo Decl., Attach. B.)
Defendants' Opposition asserts that the script in use at the time the TRO went into effect clearly disclaimed affiliation with the government and notes that the calls recorded by FTC investigators demonstrate that Defendants were up-front with consumers regarding the fact that they were not a governmental agency nor were they affiliated with a government agency. (Opp. 11.) This claim is misleading for several reasons. As discussed in more detail later, several days before the TRO issued, Defendants learned of an FTC action against *1208 a similar debt relief company and made immediate efforts to overhaul their scripts and policies. Section III.D, Supra. Thus, the script in use at the time the TRO issued is not necessarily indicative of the script used over the previous three years.
Other scripts obtained by the FTC reveal that Defendants have not always been so forthcoming. In one, for instance, agents were instructed to inform consumers that "We are NOT the Department of Education. We are a document preparation agency ... (Only if they ask)."[8] (Kondo Decl., Attach. C.) This "only if they ask" approach is consistent with agents' behavior during the FTC recordings. When the investigators do not ask directly about affiliation with the Department of Education, Defendants' agents do not volunteer that information.[9]
c. Defendants Falsely Led Consumers to Believe that They Could Permanently Reduce Monthly Payments or Interest Rates
The FTC has further provided evidence showing that Defendants falsely claim to qualify or approve consumers for lower interest rates or permanently reduced monthly payments. One frequent claim is that consolidating the borrower's loans will result in a reduced-or even 0%-interest rate. (See e.g. , PX 32 1262:2-8.) In reality, the interest rates for federal student loans are set by Congress and there are no federal student loans with a 0% interest rate. (Lee Decl. ¶ 8.)
Another tactic employed by Defendants is to represent to consumers that they can permanently reduce the monthly payment or the overall balance of the loan. (See e.g. , PX 1, 127; PX 23 ¶ 3; Neither of these results are possible under the existing federal loan repayment programs. While it is possible to lower monthly payments by enrolling in an IDR program, these programs are, by definition, income-based and the monthly payment will change year-to-year in lockstep with the borrower's income.[10] (Lee Decl. ¶ 8.) Defendants therefore misled consumers when they claim to be able to permanently lower monthly payments.
Other statements imply that borrowers' student loan debt will be eliminated upon payment of Defendants' up-front fee. For instance, in a script obtained by Plaintiff, Defendants' agents are instructed to tell consumers that the "3rd and final payment is the most important payment of all which will put you on the revised pay as you earn plan at (monthly payment of $0) and completes your enroll you [sic] into the forgiveness programs through the Department of EDU." (Kondo Decl., Attach. A1; PX 23 ¶ 3.)
Defendants tout the fact that they were able to achieve $0 monthly payments for at least 9,655 of their customers. (Second Supplement of Benjamin Naderi ¶ 9.) This argument, however, does Defendants no favors. In order to qualify for $0 monthly payments under one of the federal student loan IDR plans, a borrower must have a yearly income below 150% of the poverty line-$18,060 for a single person or *1209 $30,630 for a family of three. See generally 34 C.F.R. § 685.208 ; 82 Fed. Reg. 8832. This indicates that Defendants are targeting vulnerable, low-income debtors and are convincing them to pay rates up to 5% of their yearly income for a service freely offered by student loan providers.
d. Disclaimers in the Contract Do not Absolve Defendants of Liability
In their opposition, Defendants argue that the language contained in the contract signed by each of their customers makes clear that Defendants are in no way affiliated with the federal government or loan servicers and are merely a document preparation company. (Opp. 13-16.) While the contract signed by Defendants' customers may contain language disclaiming affiliation with the government and stating that it is simply a document preparation company, Defendants' agents made representations directly at odds with this language. See Section III.C.b, Supra. Furthermore, Defendants use of high pressure tactics discouraged consumers from meaningful review of these contractual agreements. (See e.g. , PX 9 ¶ 6; PX 11 ¶ 4; PX 23 ¶ 6.)
Plaintiff does not dispute the language in the contract, but allege that consumers are rushed throughout the sell and are encouraged to sign the documents quickly while still on the phone with Defendants' agents. One example of this is found in Defendants' script which instructs the agent on how to pressure a consumer asking for time to consider the offer: "unfortunately, the underwriting [sic] do need to know if you would like to accept or decline your forgiveness today." (Kondo Decl., Attach. 1.) Another document states that "[t]he goal is to get the client to trust you so much they feel [sic] they do not feel the need to read the document, even though there is nothing to hide." (Kondo Decl., Attach D.)
The Court finds that misleading statements made to consumers are not remedied by the simple presence of disclaimers in a contract, especially when aggressive sales tactics are used to rush consumers through the process. In Resort Car Rental System, Inc. v. F.T.C. , the Ninth Circuit held that the F.T.C. Act is "violated if [defendant] induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract." 518 F.2d 962, 964 (9th Cir. 1975). Defendants attempt to distinguish this case by arguing that it only applies when there are multiple contacts with the consumer. This argument is unconvincing because it ignores the central reasoning of Resort Car -that the psychological effect of deceptive misrepresentations cannot be rectified simply by presenting a contract with contrary provisions. In Resort Car , the Court considered the effect of a misleading advertising jingle. Certainly the psychological impact of a 1-2 hour long conversation riddled with misrepresentations is far greater than that of a simple slogan.
For these reasons, Plaintiff has met its burden of establishing a likelihood of success on the merits of its claim based on Section 5 of the FTC Act.
2. Violations of the Telemarketing Sales Rule
In additional to Section 5 of the FTC Act, Plaintiff alleges that Defendants violated at least three distinct portions of the FTC's Telemarketing Sales Rule: (1) the provision against advance fees for debt relief services; (2) the provision forbidding misrepresentation of affiliation; and (3) the provision barring material misrepresentations regarding debt relief services. The Court finds that the Plaintiff has met its burden of demonstrating likelihood of success on the merits of each of these three claims.
*1210 As an initial matter, the Court finds that Defendants are engaged in telemarketing and therefore qualify as telemarketers under the definition provided in the rule. "Telemarketing means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2. It is undisputed that Defendants were engaged in a nationwide marketing campaign and were seeking to induce the purchase of its services through the use of interstate telephone calls. Defendants' marketing campaign utilized ads placed on social media sites as well as email and cold calls to consumers. (Compl. ¶¶ 35-56.) As telemarketers, Defendants' actions are governed by the FTC's TSR.
The Court finds that Defendants were in violation of the TSR's provision regarding advance fees for debt relief services. This provision forbids sellers and telemarketers from requesting or receiving any fee for debt relief services before: (1) renegotiating, settling, reducing, or otherwise altering the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and (2) the customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor. 16 C.F.R. § 310.4(a)(5)(I). One of the primary justifications for this restriction is that "debt relief services ... frequently take place in the context of high pressure sales tactics, contracts of adhesion, and deception." 75 Fed. Reg. 48458. Moreover, some "telemarketers of debt relief services have exhorted consumers to fill out the enrollment documents and return the papers as quickly as possible." Id. As discussed above and reported by numerous consumers, these are precisely the type of tactics used by Defendant to secure contracts while intentionally misleading customers as to the terms of the agreement. Section III.C.1.d, Supra.
The transcripts and consumer complaints make clear that Defendants had a consistent policy of requiring up-front payment for its services. (See e.g. , PX 35 1347:15-19 ("The fastest option is also the cheapest option. If you do a one-time installment of $499, that will secure your loan within 30 to 60 days.")) In fact, Defendants would not perform the requested services until it had received payment in full and would delay services for those who elected to pay using an installment plan. (See e.g. , PX 35 1348:11-14.) While awaiting final payment from its customers, Defendants would place consumers' loans into forbearance. Because the loans are in forbearance at the time Defendants collect their fee, consumers cannot have made any payments pursuant to the new agreement-a clear violation of the up-front payment rule.
Defendants are also in violation of the TSR's rule regarding misrepresentation of affiliation. The Rule forbids sellers or telemarketers from "misrepresenting, directly or by implication, in the sale of goods or services ...[its] affiliation with, or endorsement or sponsorship by, any person or government entity." 16 C.F.R. § 310.3(a)(2). As discussed above, the FTC has clearly established a likelihood of showing that Defendants have misled consumers in regard to this issue. Section III.C.1.b, Supra.
Finally, Plaintiff has shown that Defendants have engaged in material misrepresentations regarding debt relief services-an act forbidden by the TSR. 16 C.F.R. § 310(a)(2)(x). As discussed in detail in the previous section, Plaintiff has shown a *1211 strong likelihood of demonstrating that Defendants have purposefully and repeatedly misled consumers regarding their options for debt relief and the ability of Defendants to obtain that relief. Section III.C.1, Supra. As such, Defendants are in clear violation of this provision.
D. The Balance of Equities Tips in Favor of Issuing a Preliminary Injunction
When balancing equities, public interests receive far greater weight than private equities. FTC v. Affordable Media , 179 F.3d 1228, 1236 (9th Cir. 1999). These interests include effective relief Where the FTC has demonstrated a likelihood of success of the merits, "a countershowing of private equities alone does not justify denial of a preliminary injunction." F.T.C. v. Warner Communications, 742 F.2d 1156, 1165 (9th Cir. 1984)
The Temporary Receiver's reports upon seizing Defendants' premises clearly evince their willingness to obfuscate and destroy evidence in an attempt to cover up their misdeeds. From the use of a self-deleting internal messaging service to destroying physical documents and deleting entire email servers, Defendants have repeatedly hindered the ability of the Court to assess their actions. (See generally, Preliminary Report; Supplemental Report.)
The Temporary Receiver's report further reveals a last minute attempt to temporarily "clean up" the business. On September 19, 2017, the FTC brought a separate, but highly similar action against another student loan operator in the L.A. area.[11] (Preliminary Report.) Defendants learned of this action the following day and immediately imposed policy changes aimed at portraying Defendants as solely a document preparation company. They shifted their focus to private loans and paused their Borrower Defense practice-a policy change that particularly rankled the commission-based agents. They set a cap on fees, issued new scripts to telephone agents, and held a training session emphasizing the new policy goals. (Preliminary Report; Supplemental Report.) Even these new scripts, however, contain material misrepresentations, again representing to consumers that they qualify for student loan forgiveness or IDR. (Declaration of Benjamin Nedari, Exh. A 14, ECF No. 40-1.)
Defendants claim that the evidence uncovered by the Temporary Receiver should not be considered by the Court because it is the product of its Temporary Restraining Order. The Court disagrees. The Temporary Receiver's immediate access is akin to expedited discovery and reports of temporary receivers are routinely relied on by courts in determining whether a preliminary injunction is appropriate. See e.g., F.T.C. v. Kutzner, Case No. 16-cv-999 (C.D. Cal Aug. 24, 2016); F.T.C. v. Data Medical Capital, Inc. , Case No. 99-cv-1266 2009 WL 2059442 (C.D. Cal July 13, 2009).
During the November 1, 2017 hearing, the Court asked the Temporary Receiver whether it would be advisable to issue a narrowly tailored preliminary injunction permitting the Defendants to regain control of the companies with certain restrictions on their business model and the type of representations they are permitted to make to consumers.[12] While the Temporary *1212 Receiver acknowledged that this type of injunction would, in theory, be ideal, he was hesitant to recommend that these particular Defendants be permitted to regain control of the companies and their assets. He cited their lack of cooperation, obstructionism, and apparent disregard for the Court's existing restrictions pursuant to the TRO.[13]
In light of the Temporary Receiver's recommendation and the other evidence presented by the FTC, the balance of equities tips clearly in favor of granting the preliminary injunction. The FTC has established that it is likely to be able to show that Defendants have a policy of misleading and deceiving consumers. Furthermore, the public has a compelling interest in ensuring the robust enforcement of federal consumer protection laws and that interest would be harmed if Defendants were permitted to continue operations. Finally, the lack of cooperation and apparently willingness to cover up their actions reveals Defendants as unrepentant and recalcitrant. Should Defendants be permitted to regain control of their companies and records, more obstruction seems the likely result. The balance of equities therefore favors the issuance of a preliminary injunction.
D. Conclusion Regarding the Propriety of Issuing a Preliminary Injunction
Because Plaintiff has met its burden of establishing the required preliminary injunction factors, the Court DISCHARGES the Order to Show Cause and ISSUES a preliminary injunction.
A separate preliminary injunction shall issue.
IT IS SO ORDERED.

Plaintiff filed 38 exhibits in support of their Application for TRO. These are labeled with the prefix "PX" and are spread between ECF Nos. 7-10.

The Department of Education has announced plans to delay promulgating a rule until at least July 1, 2019. 82 Fed. Reg. 49155.

Because these programs have been available for less than 20 years, no borrowers have yet had their debt forgiven pursuant to IDR plans.

One script instructs debtors in forbearance that "You will receive a letter directly from your current lender indicating your loans are in Forbearance status with past payments bringing your account current. Although they want you to make payments towards the interest it won't be necessary since your (Lender) will no longer be your lender and will receive a payoff request in full." (Kondo Decl., Attach. F1.)

Defendants repeatedly tout an A rating from the Better Business Bureau, however many of the Corporate Defendants operate under pseudonyms, making this a less persuasive argument.

Instructing agents on how to respond if asked about the company's statistics regarding successful BDR claims: "We do not take cases we can not win. Your school used words such a guarantee, and statistics, and that is why you have a valid claim." (Kondo Decl., Attach. C.)

See e.g. , PX 7 ¶ 4 ("[Defendant] represented the Department of Education"); PX 9 ¶ 3 ("worked with the Department of Education"); PX 13 ¶ 4 ("part of a task force for the Obama Administration"); PX 18 ¶ 5 ("the company worked directly with the DOE"); PX 19 ¶ 3 ("was with the federal government"); PX 20 ¶ 3 ("[agent] told [consumer] he was contacting the U.S. Department of Education"); PX 25 ¶ 3 ("[Defendant] worked directly with the Department of Education (DOE), that they were a middleman for the government, that they were certified..."); PX 26 ¶ 3 ("[Agent] told me that [Defendant] worked directly with the Department of Education.")

A similar note contains "only if they ask" handwritten next to the words "We are not the dept. of Education, we are a document preparation agency." (Kondo, Decl., Attach. J.)

In one case, the agent confirmed that the company was "certified through the Department of Education." (PX 34 1324:24-1325:2.)

In once script, Defendants acknowledge this, but greatly understate the effect: "If your income increases, your payment may increase a few dollars but nothing too excessive." (Kondo Decl., Attach. G.)

Federal Trade Commission v. M&T Financial Group, et al. , Case No. 2:17-cv-6855 (C.D. Cal.)

The Court asked specifically about the requirement of a disclaimer stating that the company is in no way affiliated with the government, that it is solely a document preparation company and cannot qualify or approve anyone for student loan repayment, forgiveness, or discharge programs, and that the services they offer are available for free through the debtors existing federal student loan servicer.

The Temporary Receiver has reason to believe that at least one defendant has withdrawn $95,000 from a bank account in defiance of the TRO and that two others are currently engaged in the very same predatory debt relief practices in a new location.